2004 OK 23

Attorney General W.A. Drew EDMONDSON, District Attorneys Virginia D. Sanders, John David Luton, James Thornley, Richard Gray, Mitchell D. Sperry, Robert E. Christian, Robert C. Schulte, Eddie Wyant and Max Cook, the Governor of Oklahoma and the Oklahoma State Bureau of Investigation, Petitioners,

v.

Jeffrey PEARCE, George Day, Eugene Eubanks, Shermon Coombes, Robert Crittenden, Clarence Stockton, Tommy Fannin, Brad Weger, Jimmy Beal, Charlie Woolard, Judy Hamilton, Merle E. Gregory, Jeffery C. Harris, Larry C. Hull, Jim Parnell, Sam Ryals, Val Holland, Sal Corillo, David Bates, Gary Carter, J.W. Chadwick, Gary Gilliam, Marci Gilliam, Louis Chaffin, Albert Dink Fair, Johnny Benett, G.W. Poyner, Frank Stansberry, Dale Hill, Danny L. Miller, Tillman L. Hammonds, Tony James, Paula Durant, Merilynn Cogburn, Robert Roebuck, John Mack Hampton, Kellyville Game Club, an Oklahoma Corp., Coleta Smith, an Individual, Clayton Smith, an Individual, Mary Knight, Jim Tyler, Earl Jones, Wilkie Flowers, Jr., T.J. Hogan, Debra E. McCarty, Odis Williamson, Steven D. Tankersley, Bob Melton, Olen Weaver, Barney Barnett, Mem Incorporated, an Oklahoma Corporation d/b/a Poultry Palace, Leanne Hornback, Kelly Barger, Barbara Bryant, Kevin Bryant, and Others Similarly Situated, Respondents.

No. 98,754.

Supreme Court of Oklahoma.

March 30, 2004.

Rehearing Denied June 7, 2004.

As Corrected July 28, 2004.

Sherry A. Todd, Assistant Attorney General, Oklahoma Attorney General's Office, Oklahoma City, OK, for petitioners.

Larry L. Oliver of Larry L. Oliver & Associates, P.C., Tulsa, OK, for all respondents except T.J. Hogan and Debra E. McCarty.

Tom C. Lane, Sr. of Tom C. Lane, Sr. & Associates and Gary E. Thompson, Sapulpa, OK, for respondents, Kellyville Game Club, an Oklahoma corporation, Coleta Smith, an individual and Clayton Smith, an individual.

PER CURIAM:

¶1 Petitioners, the Oklahoma Attorney General and Governor, certain district attorneys and the Oklahoma State Bureau of Investigation request us to assume original jurisdiction to grant declaratory relief upholding the constitutionality of 21 O.S.Supp.

2003, § 1692.1 et seq., (the Act) passed by a vote of the electorate via the initiative process at the November 2002 election. Generally, the Act bans cockfighting (as defined) and related activities, outlaws being a knowing spectator at cockfighting events and sets criminal penalties for violating the Act's terms. The Act also contains a forfeiture provision that comes into play following a conviction under certain sections of the Act.[1]

¶ 2 Petitioners initiated this case after respondents and others—individuals and companies involved in aspects of cockfighting—obtained temporary restraining orders (TROs) and/or temporary injunctions against enforcement and/or prosecution under the Act in several State district courts.[2] Re-

---

1. Title 21 O.S.Supp.2003, §§ 1692.1–1692.9 (the Act), provides:

 § 1692.1:

 As used in this act:

 A. "Cockfight" or cockfighting" is a fight between birds, whether or not fitted with spurs, knives, or gaffs, and whether or not bets or wagers are made on the outcome of the fight, and includes any training fight in which birds are intended or encouraged to attack or fight with one another.

 B. "Equipment used for training or handling a fighting bird" include knives or gaffs, cages, pens, feeding apparatuses, training pens and other related devices and equipment, and is hereby declared contraband and subject to seizure.

 § 1692.2:

 Every person who willfully instigates or encourages any cockfight, upon conviction, shall be guilty of a felony. The penalty for a violation of this section shall be as provided in [§ 1692.8(A)] of this act.

 § 1692.3:

 Every person who keeps any pit or other place, or knowingly provides any equipment or facilities to be used in permitting any cockfight, upon conviction, shall be guilty of a felony. The penalty for a violation of this section shall be as provided in [§ 1692.8(A)] of this act.

 § 1692.4:

 Every person who does any act or performs any service in the furtherance of or to facilitate any cockfight, upon conviction, shall be guilty of a felony. Such activities and services specifically prohibited by this section include, but are not limited to: promoting or refereeing of birds at a cockfight, advertising a cockfight, or serving as a stakes holder of any money wagered on any cockfight. The penalty for a violation of this section shall be as provided in [§ 1692.8(A)] of this act.

 § 1692.5:

 Every person who owns, possesses, keeps, or trains any bird with the intent that such bird shall be engaged in a cockfight, upon conviction, shall be guilty of a felony. The penalty for a violation of this section shall be as provided in [§ 1692.8(A)] of this act.

 § 1692.6:

 Every person who is knowingly present as a spectator at any place, building, or other site where preparations are being made for a cockfight with the intent to be present at such preparation or cockfight, or is knowingly present at such cockfight, upon conviction shall be guilty of a misdemeanor. ·

 § 1692.7:

 Following the conviction of a person for [§ 1692.2, § 1692.3, § 1692.4 or § 1692.5] of this act, the court entering the judgment shall order that the birds and knives or gaffs used in violation of this act be forfeited to the state, and may order that any and all equipment described in [§ 1692.1] used in violation of this act be forfeited to the state.

 § 1692.8:

 A. Every person who is guilty of a felony under any of the provisions of [§ 1692.2, § 1692.3, § 1692.4 or § 1692.5] of this act shall be punished by imprisonment in the state penitentiary for not less than one (1) year nor more than ten (10) years, or shall be fined not less than Two Thousand Dollars ($2,000.00) nor more than Twenty-five Thousand Dollars ($25,000.00), or by both such fine and imprisonment.

 B. Every person who upon conviction is guilty of any of the provisions of [§ 1692.6] of this act shall be punished by imprisonment in the county jail for not more than one (1) year, or shall be fined not more than Five Hundred Dollars ($500.00), or by both such fine and imprisonment.

 § 1692.9:

 Nothing in this act shall prohibit any of the following:

 A. Hunting birds or fowl in accordance with Oklahoma regulation or statute, including but not limited to the sport of hunting game with trained raptors.

 B. Agricultural production of fowl for human consumption.

2. According to materials in the January 15, 2003 Petitioner's [sic] Appendix to Brief in Support of Application to Assume Original Jurisdiction and Petition for Declaratory Relief, petitions challenging the Act's constitutionality were filed by respondents (or others similarly situated) and pending in the following counties when this proceeding was filed: Adair, Atoka, Bryan, Carter, Cherokee, Choctaw, Coal, Comanche, Cotton, Creek, Garvin, Jefferson, Johnston, Logan, Love, Marshall, McClain, McCurtain, McIntosh, Murray, Muskogee, Pawnee, Pushmataha, Sequoyah, Stephens and Wagoner. District attorneys and the Oklahoma State Bureau of Investigation

spondents ask us to decline assuming original jurisdiction and, alternately, should we assume it, to hold the Act unconstitutional based on challenges raised by them under multiple provisions of the United States and Oklahoma Constitutions. We assume original jurisdiction and uphold the facial constitutionality of the Act over the challenges made by respondents.[3]

## PART I. THE DISTRICT COURT ACTIONS AND RESPONDENTS' GENERAL CONSTITUTIONAL CHALLENGES.

¶ 3 Although we have not been provided all trial court petitions filed in the district court cases, we have before us the trial court petition filed in McCurtain County. That case was filed by eight plaintiffs, who are also respondents here.[4] Based on review of materials submitted by both petitioners and respondents, we understand the allegations and arguments made in McCurtain County are representative of the allegations and arguments made by respondents in the other district court cases.[5]

¶ 4 In the McCurtain County case, five plaintiffs allege involvement in the sport of cockfighting for many years and that they are subject to being prosecuted under the Act for their associations and actions in the cockfighting business. Another plaintiff is described in the petition as a long time cockfighter involved in all aspects of the industry and that he is also subject to being prosecuted under the Act. A seventh plaintiff is alleged to enjoy watching birds fight in his backyard and at cockfighting derbies and that his activities will subject him to criminal prosecution under the Act. The eighth plaintiff alleges: involvement in the sport of cockfighting for many years as a breeder and grower selling game fowl in the international market; he does not compete in fighting

(OSBI) are named as defendants in one or more of the cases, though not all district attorneys so named are parties here. Other defendants include the Sheriffs in the respective counties, but no such Sheriff is a party here. In the Logan County case, the State of Oklahoma ex rel., Frank Keating, former Governor of Oklahoma, is named a defendant, as is A. Dewade Langley, in his official capacity as OSBI Director. Further, though Larry L. Oliver appeared as counsel for all respondents in this case, in February 2003 he filed an amended entry of appearance that, in effect, indicates he appears for all respondents, except T.J. Hogan and Debra E. McCarty (apparently plaintiffs in the Logan County case).

3. We note, it is unnecessary to refer this matter to a referee of this Court for the taking of testimony or hearing of evidence as we do not deem there to be any controverted question of material fact required to be resolved to enable us to rule on the constitutional challenges as a facial matter. *See* Oklahoma Supreme Court Rule 1.192, 12 O.S.2001, Ch.15, App. 1. We also believe oral argument—not a matter of right in this Court— would not materially assist us in our disposition. *See* Oklahoma Supreme Court Rule 1.191(g), 12 O.S.2001, Ch.15, App. 1. We also note final briefing in this case was concluded in late November 2003.

Prior to the November 2002 election matters involving the initiative petition or the process related to it were before us. *See In re Initiative Petition No. 365*, 2001 OK 98, 55 P.3d 1048; *In re Initiative Petition No. 365*, 2000 OK 85, 14 P.3d 545; *In re Initiative Petition No. 365*, 2000 OK 47, 9 P.3d 78. The constitutional issues now here were not decided at the pre-election stage.

4. The November 2002 McCurtain County petition is contained in petitioners' January 2003 appendix. The plaintiffs in the McCurtain County case are respondents, G.W. Poyner, Frank Stansberry, Dale Hill, Danny L. Miller, Tilman L. Hammonds, Tony James, Paula Durant, Merilynn Cogburn and others similarly situated. Mr. Hill is named as Stephen Dale Hill in the McCurtain County case petition caption rather than as Dale Hill, the name appearing in the caption of petitioners' January 15, 2003 Application to Assume Original Jurisdiction and Petition for Declaratory Relief in the instant case. Also, Mr. Hammonds' first name is spelled Tilman in the McCurtain County caption, but Tillman in the caption of petitioners' January 2003 Application, etc. We assume the Mr. Hill and Mr. Hammonds named in the McCurtain County case are the same as those named as respondents in this case. These minor discrepancies (or similar ones) are not pertinent to our disposition here.

5. Respondents have incorporated in support of their constitutional challenges a November 8, 2002 brief (Plaintiffs' Preliminary Brief in Support of their Challenge to the Constitutionality of State Question 687 to Ban "Cockfighting" in Oklahoma as Approved by the Electorate) filed by plaintiffs in the McCurtain county case. See pp. 2–3 of October 20, 2003 Respondents' Response Brief to Petitioners' Brief in Support of Application to Assume Original Jurisdiction and Petition for Declaratory Relief. This November 2002 brief is contained in petitioners' January 2003 appendix. Respondents also inform at pg. 2 of their October 2003 Respondents' Response Brief, etc. that the petitions filed in the various district court cases are essentially the same as the one filed in McCurtain County.

cocks; he stands to lose two hundred fifty thousand dollars ($250,000.00), including his farm if the law is enforced; and that he is subject to prosecution under the Act for his associations and actions in the cockfighting business.

¶ 5 The McCurtain County petition also alleges that prior to passage of the Act cockfighting was legal in Oklahoma and that there were over fifty thousand (50,000) citizens like plaintiffs directly involved in cockfighting as breeders, owners, participants, spectators or as suppliers of feed and cockfighting-related products, who stand to sustain substantial damage by virtue of the Act becoming law. The petition also alleges cockfighting in Oklahoma is a major sporting industry with an estimated investment in the State in excess of one hundred million dollars ($100,000,000.00), there are an estimated five hundred thousand (500,000) game fowl in the State involved in the cockfighting industry and that major breeders of game fowl in Oklahoma have historically marketed their game fowl throughout the State, the United States and internationally. The petition also alleges the Act provides for no grace period for persons owning game fowl to protect their investment.[6]

¶ 6 The petition further, in effect, alleges the Act's terms, if enforced 1) constitute a deprivation of private property for public use without just compensation; 2) unconstitutionally impinge upon or impair the obligation of contracts, which one or more of the plaintiffs or others similarly situated are parties to, including contracts to sell birds to be used in cockfighting, contracts legal when made but which cannot legally be performed without violating the Act's terms; and 3) unconstitutionally infringe upon free speech and associational rights. In either the McCurtain

County petition, a brief filed in that case or in briefs or submissions in this case, respondents attack the constitutionality of the Act under: U.S.CONST. art. I, § 10 (impairment of obligation of contracts); U.S.CONST. amend. I (First Amendment—speech, associational or assemblage rights); U.S.CONST. amend. V (Fifth Amendment—taking of private property for public use without just compensation); U.S.CONST. amend. XIV, § 1 (Fourteenth Amendment—vague and overbroad provisions violating liberty and property rights without due process); and as violative of the fundamental right to travel. The Act is also attacked under: OKLA. CONST. art. 2, § 2 (unconstitutionally denies inherent rights to life, liberty, the pursuit of happiness and the enjoyment of the gains of their own industry); OKLA.CONST. art. 2, § 3 (right of assembly); OKLA.CONST. art. 2, § 7 (deprivation of liberty or property without due process); OKLA.CONST. art. 2, § 15 (impairment of obligation of contracts); OKLA.CONST. art. 2, § 22 (free speech rights); OKLA.CONST. art. 2, § 24 (taking or damaging private property for public use without just compensation); and, finally, OKLA.CONST. art. 5, § 57 (the Act unconstitutionally concerns multiple subjects not clearly expressed in the ballot title voted on by the electorate).[7]

¶ 7 We have also been provided with the Order Granting Temporary Injunction entered by the trial judge in the McCurtain County case, as consolidated with cases in Choctaw and Pushmataha Counties.[8] The Order basically sets forth that testimony was presented by the plaintiffs at a hearing there to the effect that gamecocks are good for only one purpose, i.e., fighting each other, that these birds are not suitable for consumption or any other purpose and because

6. WEBSTER'S NEW COLLEGIATE DICTIONARY, 467 (1979) defines game fowl as, "a domestic fowl of a strain developed for the production of fighting cocks" and gamecock as, "a male game fowl."

7. The McCurtain County petition also cites OKLA.CONST. art. 2, § 9, which provides, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishments inflicted." The briefs before us from respondents contain neither argument nor authority

supporting a violation of this constitutional provision and we decline to consider it here. *See Anderson v. Dyco Petroleum Corp.*, 1989 OK 132, 782 P.2d 1367, 1379 (issues not supported by argument and authority are waived).

8. The Order Granting Temporary Injunction is contained in respondents' October 20, 2003 Appendix to Response Brief to Petitioners' Brief in Support of Application to Assume Original Jurisdiction and Petition for Declaratory Relief.

there is no market for them, other than for fighting, their owners will be forced to destroy them or, if said birds are not destroyed, their owners will be subject to criminal prosecution under the Act. The trial judge, apparently relying on this testimony, actually concluded in. the Order Granting Temporary Injunction that the State is, in effect, forcing them to destroy their birds, cockfighting equipment and other property.[9]

¶ 8 The Order Granting Temporary Injunction also indicates that evidence was presented indicating there are seven thousand (7,000) Oklahoma members of the Game Fowl Breeders Association; that some breeders have contracts for the sale of their birds, including futures contracts; gamecock operations range from three hundred (300) to seven hundred (700) birds with values ranging from seventy-five thousand dollars ($75,-000.00) to one hundred thousand dollars ($100,000.00); and that some gamecock operations have mortgages under which the birds are considered net assets and pledged as collateral. The Order Granting Temporary Injunction further sets forth that none of the testimony offered by plaintiffs was challenged by the defendants there and defendants, who were represented either by an Assistant Attorney General or the local District Attorney, offered no witnesses.

¶ 9 With these matters understood, we turn to the issues of the propriety of assuming original jurisdiction and then to the constitutional challenges to the Act.

## PART II. PROPRIETY OF ASSUMING ORIGINAL JURISDICTION.

█ ¶ 10 When a matter involves a controversy over which both this Court and the district courts have concurrent jurisdiction (as here), the determination whether to assume original jurisdiction in a particular case is discretionary with this Court. *See Keating v. Johnson*, 1996 OK 61, 918 P.2d 51, 55. Also, we have recognized that the framers of the Oklahoma Constitution intended this Court primarily as an appellate court. *Id.* at 56; *Jarman v. Mason*, 1924 OK 722, 229 P. 459, 464. It was stated in *Kitchens v. McGowen*, 1972 OK 140, 503 P.2d 218, *Syllabus by the Court:*

> The original jurisdiction of the Supreme Court, when concurrent with that of the district court, is intended primarily as a 'stand by' service which it will exercise only when, from the exigencies of the case, great injury will be done by its refusal so to do. A different rule would so flood this court with original actions as to destroy its efficiency as an appellate court.

█ ¶ 11 Two central themes run through most of our cases where original jurisdiction has been assumed in the context of concurrent district court jurisdiction. *Keating*, 918 P.2d at 55. One, the matter must concern the public interest, i.e., the case is *publici juris* in nature, which essentially means affecting the people or community at large. *Id.* Two, there must be some urgency or pressing need for an early decision. *Id.*

9. We must note here that neither the State nor any provision of the Act forces respondents or others similarly situated to destroy any property or equipment, nor do any of the Act's provisions subject one to criminal prosecution if he/she does not destroy such property. The Act, although it does outlaw possession of birds with the intent to fight them and prohibits the use of certain equipment in conjunction with cockfighting, nowhere outlaws the mere possession of any property or requires the destruction of any birds or property. Any destruction of avian creatures, or property related to them, is respondents' choice. However, we deem it advisable to note, should respondents or others similarly situated make a choice to destroy their game fowl or gamecocks, we assume any destruction will be carried out in a humane manner and in a way that does not violate any law of the State of Oklahoma or of the United States. We also deem it worth noting that case law seems to have recognized that

rather than being only useful for fighting purposes, gamecocks have also been used for show at competitions based on appearance. *See e.g., Commonwealth v. Balog*, 448 Pa.Super. 480, 672 A.2d 319 (1996), *cert. denied*, 519 U.S. 1129, 117 S.Ct. 987, 136 L.Ed.2d 869 (1997); *Hogan v. Gridelli*, 129 Or.App. 539, 879 P.2d 896 (1994). We finally note that as to property which apparently has been used by respondents in relation to gamecocks or game fowl in the role of fighting or breeding for fighting, respondents themselves admit that, at least, some of said property has multiple uses, some of which have nothing to do with the fighting of gamecocks. See pg. 8, numbered ¶ 41(a) of McCurtain County petition, attached to petitioners' January 2003 appendix and pg. 11 of Supplement to Respondents' Response Brief to Petitioners' Brief in Support of Application to Assume Original Jurisdiction and Petition for Declaratory Relief filed with this Court on November 6, 2003.

**614**

Also, it is the **rare** case that will be entertained on original jurisdiction that requests declaratory relief. *Keating,* 918 P.2d at 57; *Ethics Commission v. Cullison,* 1993 OK 37, 850 P.2d 1069, 1072. Here, petitioners request such relief in the form of a declaration of the Act's constitutionality.

■ ¶ 12 There appears little question the matter is *publici juris* in nature, dealing as it does with the constitutionality of an Act banning cockfighting and related activities that was recently passed through the initiative process by a statewide vote of Oklahoma's electorate. The first prong of the *Keating* test for this Court assuming original jurisdiction is met. The second prong, immediacy, is admittedly more problematic and difficult to detect. However, we believe there is a pressing need to rule on the matter at the present time in view of the nature of the controversy before us and, thus, we exercise our discretionary authority to assume original jurisdiction to rule on the constitutional challenges raised by respondents.

¶ 13 In that numerous district courts have enjoined enforcement of the Act (either by TROs or temporary injunctions) in over twenty-five (25) counties and there was a lack of equitable authority to do so, assumption of original jurisdiction is necessary to advise the district courts as to the propriety of enjoining enforcement of a criminal enactment in the exercise of their equitable power. Secondly, but relatedly, respondents' challenges to the Act, as a facial matter, are unavailing and without merit because no legitimate property right of theirs has been unconstitutionally impinged upon or taken, nor has any fundamental right of theirs been violated by the Act under review.

■ ¶ 14 The parameters for enjoining enforcement or prosecution under a criminal statute were set forth in *Anderson v. Trimble,* 1974 OK 2, 519 P.2d 1352, *cert. denied,* 419 U.S. 995, 95 S.Ct. 308, 42 L.Ed.2d 269 (1974), as well as numerous other cases. The general rule as to when it is appropriate for a civil court in an equity proceeding to enjoin prosecution or enforcement under a criminal statute or municipal ordinance, is as follows: 1) the statute or ordinance is void or unconstitutional; 2) if a criminal proceeding is allowed to proceed property rights would be destroyed; and 3) irreparable injury would be inflicted without an injunction. *See e.g., Whitson v. City of Cherokee,* 1935 OK 650, 46 P.2d 907; *Allen v. Oklahoma City,* 1935 OK 1143, 52 P.2d 1054; *Oklahoma City v. Norton–Johnson Buick Motor Co.,* 1934 OK 425, 36 P.2d 278; *City of Blackwell v. Griffith Amusement Co.,* 1932 OK 320, 16 P.2d 233; *see also Dobbins v. City of Los Angeles,* 195 U.S. 223, 25 S.Ct. 18, 49 L.Ed. 169 (1904)(criminal proceedings may be enjoined when arbitrary and discriminatory exercise of police power under Fourteenth Amendment equal protection analysis, if property rights will be destroyed by enforcement of law or ordinance). All three prerequisites must coincide for an injunction to be appropriate. *See Whitson,* 46 P.2d at 908; *State ex rel. Hensley v. Eubanks,* 1962 OK CR 2, 368 P.2d 253, 255.

■ ¶ 15 One of the main reasons for the restrictive rule as to when it is appropriate for equity to enjoin pending or threatened prosecution under a criminal statute is based on the separation of powers doctrine, i.e., the judiciary should be reluctant to unnecessarily interfere in the workings of the other two branches of government, the executive and legislative, in the exercise of their authority/power. *See Rathke v. MacFarlane,* 648 P.2d 648, 651–652 (Colo.1982). Before a court may enjoin the enforcement of a criminal statute, exceptional circumstances must be shown. *Id.* at 653. Injunctive relief must be necessary to protect existing legitimate property rights or fundamental constitutional rights. *Id.* As noted above, the Act under consideration does not unconstitutionally impinge on legitimate/recognized property interests or violate any fundamental right of respondents.[10]

10. *Anderson v. Trimble,* 1974 OK 2, 519 P.2d 1352, *cert. denied,* 419 U.S. 995, 95 S.Ct. 308, 42 L.Ed.2d 269 (1974), seems to limit equitable power to enjoin enforcement of a penal/criminal statute to only those situations where property rights are involved, as opposed to those involving the prevention of injuries to personal rights. The Colorado Supreme Court in the case of *Rathke v. MacFarlane,* 648 P.2d 648, 652–653 and n. 5 (Colo.1982), recognized that in some situations

¶16 The immediacy or pressing need prong of the two-part test for deciding whether original jurisdiction should be assumed is satisfied because, in effect, the TROs and/or temporary injunctions, have made it impossible for law enforcement officials in over twenty-five (25) counties to carry out their duties under the Act, even though no valid basis has been espoused by respondents to enjoin enforcement or prosecution under the Act. Without involvement of this Court to remedy this frustration of a valid criminal enactment, the present state of affairs may be allowed to continue for a lengthy period of time, even though no valid equitable basis has been put forward by respondents to thwart enforcement of the Act. We, thus, believe the instant situation involves one of those rare circumstances appropriate for the assumption of original jurisdiction to grant declaratory relief.

## PART III. GENERAL STANDARD OF REVIEW—CONSTITUTIONALITY OF STATUTE.

■ ¶17 The general rules concerning the standard of review applicable when a statutory enactment is attacked on constitutional grounds were spelled out in *Fent v. Oklahoma Capitol Improvement Authority*, 1999 OK 64, ¶¶ 3–4, 984 P.2d 200, 204, *cert denied*, 528 U.S. 1021, 120 S.Ct. 531, 145 L.Ed.2d 411 (1999). In *Fent*, this Court said:

In considering a statute's constitutionality, courts are guided by well established principles. A heavy burden is cast on those challenging a legislative enactment to show its unconstitutionality and every presumption is to be indulged in favor of the constitutionality of a statute. If two possible interpretations of a statute are possible, only one of which would render it unconstitutional, a court is bound to give the statute an interpretation that will render it constitutional, unless constitutional infirmity is shown beyond a reasonable doubt. A court is bound to accept an interpretation that avoids constitutional doubt as to the legality of a legislative enactment.

It is also firmly recognized that it is not the place of this Court, or any court, to concern itself with a statute's propriety, desirability, wisdom, or its practicality as a working proposition. [T]he judiciary cannot challenge the wisdom, need or desirability of any constitutionally valid legislation. Such questions are plainly and definitely established by our fundamental law as functions of the legislative branch of government. Respect for the integrity of our tripartite scheme for distribution of governmental powers commands that the judiciary abstain from intrusion into legislative policymaking. A court's function, when the constitutionality of a statute is put at issue, is limited to a determination of the validity or invalidity of the legislative provision and a court's function extends no farther in our system of government.

*Id.* (citations omitted). That the Act under review was promulgated by the people via the initiative process in the exercise of their retained legislative power (rather than by the Legislature) makes the above-delineated tenets no less applicable. In other words, a statutory enactment passed by the people through the initiative is entitled to the same presumption of constitutionality as one passed by the Legislature.[11] With this gen-

---

the protection of fundamental rights (e.g., speech or religion) may also appropriately call into play the equitable authority of a court to enjoin enforcement of a criminal enactment when repeated arrests and prosecutions violative of such rights are implicated. Even if we assume here that in certain circumstances impingement upon such fundamental rights would be sufficient for invocation of equitable cognizance, the Act under review, as a facial matter, does not unconstitutionally impinge on such rights so as to require equitable interference with the workings of the criminal law.

**11.** OKLA.CONST. art. 5, § 1 provides as follows concerning the legislative authority of the State and the power of Oklahoma's citizenry to enact legislation independent of the Legislature:

The Legislative authority of the State shall be vested in a Legislature, consisting of a Senate and a House of Representatives; **but the people reserve to themselves the power to propose laws** and amendments to the Constitution **and to enact or reject the same at the polls independent of the Legislature,** and also reserve power at their own option to approve or reject at the polls any act of the Legislature. (emphasis added).

eral review standard in mind, we now turn to consider respondents' particularized constitutional challenges.

## PART IV. THE ACT DOES NOT TAKE OR DAMAGE PRIVATE PROPERTY FOR PUBLIC USE WITHOUT JUST COMPENSATION.

¶ 18 In essence, respondents argue that the terms of the Act, i.e., prohibiting the use of birds (including gamecocks) for fighting purposes, constitute a regulatory taking or damaging of their property for public use without just compensation.[12] Respondents' argument in such regard (as with their assertions concerning impairment of contracts and their inherent rights to life, liberty, the pursuit of happiness and to the enjoyment of the gains of their own industry), present a classic example of the tension between the freedom of an individual to do as he/she will with his/her property and the interest of society or the community at large, acting through the legislative process (here by initiative), to place reasonable restrictions on the use of property to promote or protect the public good by the passage of laws. In the circumstances of this case, the interests of society and the community at large prevail.[13]

¶ 19 Although respondents seem to assume using birds for fighting is a cognizable or recognized property right or interest subject to protection under takings analysis, something we deem questionable, even if we assume the use of birds for such a purpose was considered a recognized property interest prior to passage of the Act, the outlawing of that one use does not constitute a regulatory taking or damaging of property for which compensation must be paid.[14] Instead,

---

**12.** U.S.CONST. amend. V (Fifth Amendment) provides in pertinent part, "nor shall private property be taken for public use, without just compensation." This restriction is applied to the States through the Fourteenth Amendment to the United States Constitution. *Keystone Bituminous Coal Association v. DeBenedictis*, 480 U.S. 470, n. 10, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). OKLA.CONST. art. 2, § 24 provides in relevant part, "[p]rivate property shall not be taken or damaged for public use without just compensation."

**13.** We deem it unnecessary in this case's context to exhaustively consider the seizure or forfeiture provisions of the Act. Although there may be some valid constitutional challenge in the application of a particular seizure as it relates to a criminal prosecution or a specific forfeiture after conviction (e.g., a procedural due process challenge), the seizure and forfeiture provisions of the Act, as a facial matter, do not constitute a forbidden taking or damaging of private property without just compensation. In the first place, the forfeiture provisions, under the express terms of § 1692.7 of the Act, do not come into play until there has been a conviction under some part of the Act. Second, as to the contraband and seizure provisions of § 1692.1(B), we have no doubt, the intent was that seizure of cockfighting-related equipment is only allowed consistent with the dictates of the search and seizure provisions of the United States and Oklahoma Constitutions, U.S.CONST. amend. IV (Fourth Amendment—as incorporated against the States through the Fourteenth Amendment), OKLA.CONST. art. 2, § 30 and pertinent State statutes concerning issuance of warrants and seizure of property. *See e.g.,* 22 O.S.2001, § 1221 et seq.

**14.** We deem questionable respondents' apparent position that using birds for cockfighting, prior to passage of the Act, was a cognizable or recognized property right or interest subject to protection under takings analysis based on the following rationale. In a case such as this where an individual or company claims that a government regulation constitutes a taking of private property for public use without just compensation, a court's first task is to evaluate whether the claimant has established a property interest for purposes of the Fifth Amendment [*Conti v. United States*, 291 F.3d 1334, 1339 (Fed.Cir.2002), *cert. denied*, 537 U.S. 1112, 123 S.Ct. 904, 154 L.Ed.2d 785 (2003)] and (as in the instant case) for purposes of OKLA.CONST. art. 2, § 24. If the claimant fails initially to demonstrate that the interest allegedly taken constitutes a recognized property interest, a court need not even consider whether the government regulation is a taking at all. *See Conti*, 291 F.3d at 1339. Respondents' argument in this case impliedly, if not expressly, posits that because it was lawful prior to passage of the Act to use or sell birds for cockfighting purposes, that such use constitutes a property interest subject to constitutional protection. Although we agree such was lawful, we do not necessarily agree that using birds to fight could ever have been said to be recognized as an identifiable property interest subject to protection under the pertinent United States and Oklahoma constitutional provisions.

Criminal statutes prohibiting cruelty to animals or instigating fights between animals have been part of Oklahoma law since at least the early 20th Century. *See Maloney v. State,* 1975 OK CR 22, 532 P.2d 78; Rev. Laws Okla.1910, § 2746 (cruelty to animals); Rev. Laws Okla. 1910, §§ 2743–2744 (instigating fights between animals; keeping place for fighting animals). Although in *Lock v. Falkenstine,* 1963 OK CR 32, 380 P.2d 278, the Oklahoma Court of Criminal

the prohibition against using birds for fighting purposes is a reasonable and proper exercise of the police power by the electorate acting in its legislative capacity to promote public morals and to ban an activity deemed injurious thereto, rather than a regulatory taking for which compensation must be paid. At a minimum, the Act serves the significant and legitimate public purpose of preventing cruelty to animals and prohibiting human involvement in bird fighting, obviously out of compassion for avian creatures.[15]

¶ 20 In *Mugler v. Kansas,* 123 U.S. 623, 668–669, 8 S.Ct. 273, 31 L.Ed. 205 (1887), the United States Supreme Court stated:

> A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit. Such legislation does not disturb the owner in the control or use of his property for lawful purposes, nor restrict his right to dispose of it, but is only a declaration by the State that its use by anyone, for certain forbidden purposes, is prejudicial to the public interests. Nor can legislation of that character come within the Fourteenth Amendment, in any case, unless it is apparent that its real object is not to protect the community, or to promote the general well being, but, under the guise of police regulation, to deprive the owner of his liberty and property, without due process of law. The power which the States have of prohibiting such use by individuals of their property as will be prejudicial to the health, the morals, or the safety of the public, is not—and, consistently with the existence and safety of organized society, cannot be—burdened with the condition that the State must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by a noxious use of their property, to inflict injury upon the community.

At the outset we acknowledge that takings analysis has undergone change and refinement since *Mugler* was decided. The *Mugler* decision preceded *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), the Supreme Court case generally thought to have given birth to the field of "regulatory takings" jurisprudence. *See Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1014–1015, 112 S.Ct. 2886,

---

Appeals held the criminal statute prohibiting the instigation of animal fighting inapplicable to the fighting of gamecocks because that court held gamecocks were not animals within the contemplation of the statute, the Court of Criminal Appeals left open the possibility of future prohibition by legislative action. *Id.* at 284. In other words, a prohibition on cruelty to animals generally has long been part of our State's history and about forty (40) years ago our own Court of Criminal Appeals foreshadowed the potential for specifically outlawing cockfighting. Thus, regulation of this type, which the Act has now conclusively extended to birds, has long been recognized as the type of law, passed either by the Legislature or the people through the initiative, which would be understood as a valid police power regulation, notwithstanding its technical previous legality. Although we need not definitively decide the issue for purposes of our disposition of this case, we have serious doubts as to whether—given this historical Oklahoma perspective—the use of birds for fighting, could ever be considered an identifiable property interest subject to protection under the United States or Oklahoma Constitutions, in regard to the taking or damaging of property.

**15.** In the Order Granting Temporary Injunction issued in the McCurtain County case it is indicated that the parties, in essence, agreed that the purpose and intent behind the law was preventing cruelty to the avian creatures covered by the Act. We must also note, however, although not a taking case, the United States Supreme Court in *Paris Adult Theatre v. Slaton,* 413 U.S. 49, n. 15, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973), quoting from On the Democratic Idea in America 33 (1972), appeared to recognize that statutes prohibiting cockfighting (and other like activities) have been promulgated for at least two purposes, 1) the prevention of cruelty to animals out of compassion for the animals and 2) because such activities have a debasing and brutalizing effect upon the citizenry witnessing such spectacles. A second purpose in addition to the prevention of animal cruelty has, thus, seemed to have been recognized for quite some time: to wit, safeguarding the public welfare by protecting our populace against the debasing and brutalizing effects upon those who witness such events. In any event, we need not rely on this other purpose to support our determination that the Act is facially constitutional. We also note petitioners here have not relied on this other purpose to support their arguments in favor of the constitutionality of the Act as a police power regulation.

120 L.Ed.2d 798 (1992). Before *Pennsylvania Coal Co.*, it was generally thought the Takings Clause only reached a direct appropriation of property or a practical ouster of the owner's possession. *Lucas*, 505 U.S. at 1014, 112 S.Ct. 2886. Plainly, *Pennsylvania Coal Co.* ushered in a new era recognizing there are limits to the exercise of the police power in regard to the regulation of property and that "if regulation goes too far it will be recognized as a taking." *Id.*, 260 U.S. at 415, 43 S.Ct. 158. Notwithstanding the changes and refinement in takings jurisprudence, it was made clear in *Keystone Bituminous Coal Association v. DeBenedictis*, 480 U.S. 470, 488–492, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987), that the basic thought expressed in *Mugler* is still sound and we are convinced that case and more recent Supreme Court jurisprudence clearly supports the determination that the Act before us for review withstands respondents' takings challenge.

¶ 21 To uphold the Act over respondents' takings challenge does not require us to express our condemnation of the activity of cockfighting. That is not our responsibility, but the responsibility of the electorate, which passed the Act in its legislative capacity. Our responsibility is only to gauge the legislation for constitutional flaw or infirmity and it is plain to us the Act passes constitutional muster as a reasonable exercise of the police power. This is so, notwithstanding that the Act may have the effect of substantially reducing the value of game fowl or gamecocks or the value of certain property used in cockfighting, or that it may have the effect of prohibiting the most beneficial use (from an economic standpoint) of such property. *See Andrus v. Allard*, 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979).

¶ 22 In *Andrus* the Supreme Court grappled with whether certain federal enactments authorizing the prohibition of commercial transactions in pre-existing avian artifacts violated the Fifth Amendment property rights of owners of such artifacts because the prohibition wholly deprived them of the opportunity to earn a profit from the relics. *Id.* at 64, 100 S.Ct. 318. In ruling against them, *Andrus* stated:

Suffice it to say that government regulation—by definition—involves the adjustment of rights for the public good. Often this adjustment curtails some potential for the use or economic exploitation of private property. To require compensation in all such circumstances would effectively compel the government to regulate by purchase. "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922); *see Penn Central, supra*, 438 U.S., at 124, 98 S.Ct., at 2659.

The Takings Clause, therefore, preserves governmental power to regulate, subject only to the dictates of " 'justice and fairness.' " *Ibid.;* 98 S.Ct., at 2659; *see Goldblatt v. Hempstead*, 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962). There is no abstract or fixed point at which judicial intervention under the Takings Clause becomes appropriate. Formulas and factors have been developed in a variety of settings. *See Penn Central, supra*, 438 U.S., at 123–128, 98 S.Ct., at 2659–2662. Resolution of each case, however, ultimately calls as much for the exercise of judgment as for the application of logic.

The regulations challenged here do not compel the surrender of the artifacts, and there is no physical invasion or restraint upon them. Rather, a significant restriction has been imposed on one means of disposing of the artifacts. But the denial of one traditional property right does not always amount to a taking. At least where an owner possesses a full "bundle" of property rights, the destruction of one "strand" of the bundle is not a taking, because the aggregate must be viewed in its entirety. *Compare Penn Central, supra*, at 130–131, 98 S.Ct., at 2662–2663 and *United States v. Twin City Power Co.*, 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240 (1956), with *Pennsylvania Coal Co. v. Mahon, supra*, and *United States v. Virginia Electric & Power Co.*, 365 U.S. 624, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961). *See also* Michelman, Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just

Compensation" Law, 80 Harv.L.Rev. 1165, 1230–1233 (1967). In this case, it is crucial that appellees retain the rights to possess and transport their property, and to donate or devise the protected birds.

It is, to be sure, undeniable that the regulations here prevent the most profitable use of appellees' property. Again, however, that is not dispositive. When we review regulation, a reduction in the value of property is not necessarily equated with a taking. *Compare Goldblatt v. Hempstead, supra,* 369 U.S., at 594, 82 S.Ct., at 990, and *Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915), with *Pennsylvania Coal Co. v. Mahon, supra.* In the instant case, it is not clear that appellees will be unable to derive economic benefit from the artifacts; for example, they might exhibit the artifacts for an admissions charge. At any rate, loss of future profits—unaccompanied by any physical property restriction—provides a slender reed upon which to rest a takings claim. Prediction of profitability is essentially a matter of reasoned speculation that courts are not especially competent to perform. Further, perhaps because of its very uncertainty, the interest in anticipated gains has traditionally been viewed as less compelling than other property-related interests. *Cf., e.g.,* Fuller & Perdue, The Reliance Interest in Contract Damages (pt. 1), 46 Yale L.J. 52 (1936).

Regulations that bar trade in certain goods have been upheld against claims of unconstitutional taking. For example, the Court has sustained regulations prohibiting the sale of alcoholic beverages despite the fact that individuals were left with previously acquired stocks. *Everard's Breweries v. Day,* 265 U.S. 545, 44 S.Ct. 628, 68 L.Ed. 1174 (1924), involved a federal statute that forbade the sale of liquors manufactured before passage of the statute. The claim of a taking in violation of the Fifth Amendment was tersely rejected. *Id.,* at 563, 44 S.Ct., at 633. Similarly, in

*Jacob Ruppert, Inc. v. Caffey,* 251 U.S. 264, 40 S.Ct. 141, 64 L.Ed. 260 (1920), a federal law that extended a domestic sales ban from intoxicating to nonintoxicating alcoholic beverages "on hand at the time of the passage of the act," *id.,* at 302, 40 S.Ct., at 150, was upheld. Mr. Justice Brandeis dismissed the takings challenge, stating that "there was no appropriation of private property, but merely a lessening of value due to a permissible restriction imposed upon its use." *Id.,* at 303, 40 S.Ct., at 151. *See Mugler v. Kansas,* 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887).

It is true that appellees must bear the costs of these regulations. But, within limits, that is a burden borne to secure "the advantage of living and doing business in a civilized community." *Pennsylvania Coal Co. v. Mahon, supra,* 260 U.S., at 422, 43 S.Ct., at 163 (Brandeis, J., dissenting). We hold that the simple prohibition of the sale of lawfully acquired property in this case does not effect a taking in violation of the Fifth Amendment.

*Andrus,* 444 U.S. at 65–68, 100 S.Ct. 318 (footnotes omitted).

¶ 23 As the Supreme Court recognized in *Lucas,* 505 U.S. at 1027–1028, 112 S.Ct. 2886 (a case involving land use regulation), a distinction exists between personal and real property for takings analysis.[16] There it was said, "[a]nd in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [a person] ought to be aware of the possibility that new regulation might even render his property economically worthless (at least if the property's only economically productive use is sale or manufacture for sale)." *Id.,* citing *Andrus,* 444 U.S. at 66–67, 100 S.Ct. 318.

¶ 24 Here we have a regulation of personal property that prohibits one use thereof. Respondents or others similarly situated retain the rights to possess, sell, trade, donate, devise or use their gamecocks or game fowl,

16. We do not deem respondents to be arguing the Act prohibiting cockfighting unconstitutionally takes or damages any land owned by them without just compensation in violation of the United States or Oklahoma Constitutions, even though it has been alleged by one plaintiff in the McCurtain County case that he stands to lose his farm if the prohibition is enforced. Accordingly, we need not delve into such an issue.

or any property related thereto, in any lawful manner or for any lawful purpose. Although their ability or opportunity to earn future profit from fighting such birds or raising or selling them for fighting may be eliminated, that is a "slender reed" upon which to base a takings claim, given their retention of full rights to use or sell their birds for other purposes. Although there was apparently evidence presented by plaintiffs in the McCurtain County case that there is no market for gamecocks and game fowl if the prohibition against fighting is upheld, given the above jurisprudence and in light of the application of judgment, logic and fairness, we do not believe the prohibition at issue here can rightfully be considered a taking or damaging of property for public use for which compensation is due.[17] Instead, the Act under review represents a non-compensable and valid exercise of the police power to outlaw one use of property which amounts to animal cruelty. We reject respondents' takings challenge to the Act.

## PART V. THE ACT DOES NOT UNCONSTITUTIONALLY IMPAIR THE OBLIGATION OF CONTRACTS.

¶ 25 Respondents also assert the Act violates the Contract Clauses of both the United States and Oklahoma Constitutions because contracts entered into prior to its passage cannot now be legally performed.[18] They give as one example, individuals having contracts to sell certain birds that will eventually be used for cockfighting. Respondents misinterpret the scope and sweep of the two Contract Clauses and it is plain the Act's provisions do not unconstitutionally impair the obligation of contracts as alleged by respondents.

¶ 26 It is well settled that the federal Contract Clause concerning no State passing any law impairing the obligation of contracts, is **not** to be read or understood literally. *Keystone Bituminous Coal Association v. DeBenedictis, supra,* 480 U.S. at 502, 107 S.Ct. 1232. Although the clause's language is facially absolute, its prohibition must be accommodated to the inherent police power of the state to safeguard the vital interests of the people. *Energy Reserves Group, Inc. v. Kansas Power and Light Co.,* 459 U.S. 400, 410, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983). The clause had as its primary focus legislation designed to repudiate or adjust pre-existing debtor-creditor relationships that obligors were unable to satisfy. *Keystone Bituminous Coal Association,* 480 U.S. at 502–503, 107 S.Ct. 1232. The Supreme Court has stated concerning the federal Contract Clause:

> [I]t is to be accepted as a commonplace that the Contract Clause does not operate to obliterate the police power of the States. 'It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which in its various ramifications is known as the police power, is an exercise of the sovereign right of the Government to protect

17. Although we are not in a position to know the absolute truthfulness of respondents' contention that there is no market for their game fowl or gamecocks other than for fighting or fighting related purposes, as we set out in *supra* note 9, it appears to have been recognized in jurisprudence that gamecocks also have been used for show at competitions based on appearance. *See e.g., Commonwealth v. Balog, supra* note 9; *Hogan v. Gridelli, supra* note 9. Furthermore, as we also mentioned in *supra* note 9, respondents themselves admit that, at least, some of their property has multiple uses. Obviously, cages or pens used in conjunction with cockfighting are examples of property having multiple uses. We also note that respondents' assertion the Act provides no grace period for those owning game fowl to protect their investment, in our view,

does not render the Act unconstitutional under the Takings Clauses of either the United States or Oklahoma Constitutions nor any other constitutional provision relied on by them to support their arguments of constitutional infirmity. No case cited by them persuasively supports constitutional invalidity in such regard nor have we found any case that does so.

18. U.S.CONST. art. I, § 10, cl. 1 provides in pertinent part, "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts...." The Oklahoma contract clause is found at OKLA. CONST. art. 2, § 15 and provides: "[n]o ... law impairing the obligation of contracts, shall ever be passed."

the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals.' *Manigault v. Springs,* 199 U.S. 473, 480, 26 S.Ct. 127, 130, 50 L.Ed. 274. As Mr. Justice Holmes succinctly put the matter in his opinion for the Court in *Hudson Water Co. v. McCarter,* 209 U.S. 349, 357, 28 S.Ct. 529, 531, 52 L.Ed. 828: 'One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them. The contract will carry with it the infirmity of the subject matter.'

*Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 241–242, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978).

¶ 27 In other words, the substance of the above quote is the long-held understanding that not every impairment of a contractual right is unconstitutional under the Contract Clause. In fact, the Supreme Court has recognized that, "[s]tates must possess broad power to adopt general regulatory measures without being concerned that private contracts will be impaired, or even destroyed, as a result. Otherwise, one would be able to obtain immunity from the state regulation by making private contractual arrangements." *United States Trust Co. v. New Jersey,* 431 U.S. 1, 22, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). In *Manigault v. Springs,* 199 U.S. 473, 26 S.Ct. 127, 50 L.Ed. 274 (1905), the Supreme Court provided examples of contracts that must appropriately yield to the police power in the form of laws intended for the public good and welfare. It said:

[C]ontracts, perfectly lawful at the time, to sell liquor, operate a brewery or distillery, or carry on a lottery ... are subject to impairment by a change of policy on the part of the state, prohibiting the establishment or continuance of such traffic; in other words, that parties, by entering into contracts, may not estop the legislature from enacting laws intended for the public good.

*Id.* at 480, 26 S.Ct. 127.

■ ¶ 28 Although police power regulation which detrimentally acts on contracts is certainly subject to limitation (*Adolph Coors Co. v. Oklahoma Alcoholic Beverage Control Board,* 1978 OK 119, 584 P.2d 717, 719), this Court has also recognized that the right of the legislative branch to act under the police power is part of the existing law at the time of the execution of every contract, and as such becomes in contemplation of law a part of the contract. *State ex rel. Roth v. Waterfield,* 1933 OK 546, 29 P.2d 24, *Third Syllabus.* Simply put, an individual or company by entering into a contract reaching into the future concerning an activity lawful when the contract was made, may not foreclose the Legislature (or the people acting in their legislative capacity) from prohibiting the activity under a reasonable exercise of the police power for the public good. We believe the Act is such a reasonable police power regulation.

■ ¶ 29 A three-part test has been employed when a state law has been alleged to fail to pass constitutional muster under the Contract Clause in regard to a contract between private contracting parties. *See Energy Reserves Group, Inc.,* 459 U.S. at 411–413, 103 S.Ct. 697. The first inquiry is whether the law has, in fact, operated as a substantial impairment of a contractual relationship. *Id.,* at 411, 103 S.Ct. 697, quoting *Allied Structural Steel Co.,* 438 U.S. at 244, 98 S.Ct. 2716. Second, if the law constitutes a substantial impairment, the State must have a significant and legitimate public purpose behind the law, such as remedying a broad and general social or economic problem. *Energy Reserves Group, Inc.,* 459 U.S. at 411–412, 103 S.Ct. 697, citing *United States Trust Co.,* 431 U.S. at 22, 97 S.Ct. 1505 and *Allied Structural Steel Co.,* 438 U.S. at 247, 98 S.Ct. 2716. The requirement of a legitimate public purpose guarantees the State is exercising its police power, rather than providing a benefit to some special interest. *Energy Reserves Group, Inc.,* 459 U.S. at 412, 103 S.Ct. 697. Finally, assuming a legitimate public purpose has been identified, the inquiry turns to whether the adjustments of the rights and responsibilities of the contracting parties is based on reasonable conditions and is of a character appropriate to the public purpose behind the law's adoption. *Id.,* quoting *United States Trust Co.,* 431 U.S. at

22, 97 S.Ct. 1505. When the State is not itself a contracting party, courts properly defer to legislative judgment as to the need and reasonableness of any specific law. *Energy Reserves Group, Inc.*, 459 U.S. at 412–413 and n. 14, 103 S.Ct. 697, citing and quoting *United States Trust Co.*, 431 U.S. at 22–23, 97 S.Ct. 1505.[19]

¶ 30 We have not been provided with any particular contract alleged to have been retroactively impaired by the Act. However, we assume one or more respondents (or others) have contracts—e.g., to sell birds to be used for fighting purposes—that were in existence prior to passage of the Act and that said contracts will be substantially impaired by the legislation because they will no longer be subject to legal performance without running afoul of the prohibitory terms of the Act. In our view, however, such impairment does not constitute a violation of the Contract Clause of either the United States or Oklahoma Constitutions.

¶ 31 Unquestionably, the people acting in their legislative capacity, were acting in furtherance of a legitimate and reasonable exercise of the police power to prevent animal cruelty and to end human involvement in such cruelty, by enacting the ban on cockfighting and related activities. This is a significant and legitimate public purpose meant to remedy a broad and general societal problem and to outlaw an activity deemed injurious to public morals.[20] We also perceive no deficiency in the terms of the Act as being of an appropriate character to carry out or implement the purpose behind the Act, particularly given the deference to which the legislative judgment is entitled as to the need and reasonableness of a particular measure. It seems to us that only by banning cockfighting and the related activities intended to lead to it can the purpose of the Act be achieved.

¶ 32 Furthermore, we believe it could not reasonably be expected by respondents or anyone else that cockfighting, simply because it was lawful prior to the Act's passage would always remain so. As set forth in **PART IV**, *supra* note 14, criminal statutes prohibiting cruelty to animals or instigating fights between animals have been part of Oklahoma law since at least the early 20th Century. *See Maloney v. State*, 1975 OK CR 22, 532 P.2d 78; Rev. Laws Okla.1910, § 2746 (cruelty to animals); Rev. Laws Okla.1910, §§ 2743–2744 (instigating fights between animals; keeping place for fighting animals).[21]

**19.** Here, of course, respondents do not allege we are dealing with any contract to which the State itself is a party. When the State itself is a party to the contract, complete deference to the legislative assessment of reasonableness and need is not appropriate because the State's self-interest is at stake. *United States Trust Co. v. New Jersey*, 431 U.S. 1, 26, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977).

**20.** Although we have found no case from the United States Supreme Court directly holding that cockfighting may be outlawed without running afoul of the Contract Clause, such was plainly implied in *dicta* contained in the case of *Exxon Corp. v. Eagerton*, 462 U.S. 176, n. 11, 103 S.Ct. 2296, 76 L.Ed.2d 497 (1983). In *Exxon Corp.*, after quoting Justice Holmes in *Hudson Water Co. v. McCarter*, 209 U.S. 349, 357, 28 S.Ct. 529, 52 L.Ed. 828 (1908) that, "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them. The contract will carry with it the infirmity of the subject matter" (*Exxon Corp.*, 462 U.S. at 190, 103 S.Ct. 2296), the following was immediately set forth in n. 11 of *Exxon Corp.*:

This point was aptly stated in an early decision holding that a statute prohibiting the issuance of notes by unincorporated banking associations did not violate the Contract Clause by preventing the performance of existing contracts entered into by members of such associations:

"[I]t is said that the members had formed a contract between themselves, which would be dissolved by the stoppage of their business. And what then? Is that such a violation of contracts as is prohibited by the Constitution of the United States? Consider to what such a construction would lead. Let us suppose, that in one of the states there is no law against gaming, cock-fighting, horse-racing, or public masquerades, and that companies should be formed for the purpose of carrying on these practices. And suppose, that the legislature of that state, being [seriously] convinced of the pernicious effect of these institutions, should venture to interdict them: will it be seriously contended, that the Constitution of the United States has been violated?" *Myers v. Irwin*, 2 Serg & Rawle 368, 372 (Pa.1816). (italics omitted).

**21.** The current statutes are found at 21 O.S.Supp.2003, § 1685 (cruelty to animals) and 21 O.S.2001, §§ 1682–1683 (instigating fights between animals and keeping places for fighting animals).

Though in *Lock v. Falkenstine*, 1963 OK CR 32, 380 P.2d 278, the Oklahoma Court of Criminal Appeals held the criminal statute prohibiting the instigation of animal fighting inapplicable to the fighting of gamecocks because that court held gamecocks were not animals within the contemplation of the statute, the Court of Criminal Appeals expressly presaged the potential for future prohibition of the activity by legislative action. *See id.* at 284. In other words, the prohibition against and criminalization of cruelty to animals generally has long been part of our State's history and over forty (40) years ago our Court of Criminal Appeals foreshadowed the potential for specifically outlawing cockfighting. Thus, regulation of this type, which the Act has now conclusively extended to birds, has long been recognized as the type of enactment (passed by either the Legislature or the people through the initiative), that would be understood as a valid police power regulation, notwithstanding its technical previous legality. Given this historical perspective, it is simply not a reasonable expectancy that an existent contract at the time of passage of the Act, which contains terms extending into the future concerning the use or sale of game fowl or gamecocks, would be immune from being overridden by valid police power regulation outlawing or prohibiting cockfighting. Therefore, we reject respondents' Contract Clause challenges.

**PART VI. THE ACT DOES NOT VIOLATE OKLA.CONST. ART 2, § 2.**

 ¶ 33 Respondents also challenge the Act under OKLA.CONST. art. 2, § 2, which provides, "[a]ll persons have the inherent right to life, liberty, the pursuit of happiness, and the enjoyment of the gains of their own industry." In the McCurtain County petition it is alleged, in effect, that the Act is unconstitutional in that it, "destroys [respondents'] inherent rights of life, liberty, pursuit of happiness, and the enjoyment of the gains of their industry without due process of law." We hold the Act does not violate OKLA. CONST. art. 2, § 2.[22]

¶ 34 In the first instance, respondents have cited no case that stands for the proposition that they or anyone else has the absolute inherent right to liberty, happiness or to enjoy the gains of their own industry through an activity that amounts to animal cruelty and we do not read their submissions to so argue. We are certainly aware of no such absolute right. Second, it has long been recognized that art. 2, § 2 was never intended to be viewed as protecting a right to do whatever one chooses or has the power to do, or that restrictions on an individual are valid only if necessary to protect the safety of others. *See One Chicago Coin's Play Boy Marble Bd. v. State*, 1949 OK 251, 212 P.2d 129, 132. It "is well settled that the legislature may, in the proper exercise of the police power, define and declare what is to be deemed injurious to public health, morals, safety and general welfare. And, the legislature is primarily the judge of whether certain facts or conditions justify regulation of a particular business for the public welfare." *Id.* (citations omitted); *See also Cotton Club v. Oklahoma Tax Commission*, 1945 OK 146, 158 P.2d 707, 708, *Second Syllabus* (police power is an inherent attribute of State sovereignty, under which the State, within consti-

---

**22.** To the extent respondents seek to challenge the Act under OKLA.CONST. art. 2, § 2 on behalf of others **not** similarly situated to themselves, e.g., a copy shop owner they allege would violate the Act by providing a self-service copy machine to print fliers for a cockfight, the challenge is unavailing. See November 8, 2002 Plaintiffs' Preliminary Brief of their Challenge to the Constitutionality of State Question 687 to Ban "Cockfighting" in Oklahoma as Approved by the Electorate, pg. 19, which is an attachment to petitioners' January 2003 appendix. As we set out *infra* in **PART IX(E)**, note 43, the Act would not apply to allow prosecution of an unknowing copy shop owner that merely unwittingly permitted the use of a self-service copy machine. Furthermore, we do not read anything respondents

have submitted to challenge the Act, merely by its passage, to have somehow deprived them of liberty, property or the gains of their industry without procedural due process. In any event, respondents received any procedural process that was their due through the initiative petition process and the subsequent November 2002 election, which resulted in the Act's passage. Also, to the extent respondents contend the Act somehow deprives them of property in violation of OKLA.CONST. art. 2, § 7, "[n]o person shall be deprived of life, liberty, or property, without due process of law," our discussion in the text as to substantive due process, here as to procedural due process and *supra* note 13, are sufficient to dispose of such contention.

tutional limitations, may decide what is dangerous to public order, safety, health, morals and the general welfare of society). In other words, the rights guaranteed in OKLA. CONST. art. 2, § 2 are qualified. They are not absolute.

¶ 35 Here, the people acting in their legislative capacity have determined that cruelty to birds is injurious to public morals and the general welfare and it is not our place to second-guess that judgment, only to review the Act for constitutional infirmity. This Court has said concerning substantive due process and the rights protected by OKLA. CONST. art. 2, § 2:

> The Legislature is primarily the judge of whether facts and conditions exist that make it advisable that any certain business be regulated for the public good, under the police power, and as to what means are best adapted to regulate it, and every possible presumption is to be indulged in favor of the correctness of such finding, and though the courts may hold views inconsistent with the wisdom of such legislation, they may not annul it as being in violation of substantive due process unless it is clearly irrelevant to the policy the Legislature may adopt or is arbitrary, unreasonable or discriminatory.

> The inherent right to "life, liberty, the pursuit of happiness, and the enjoyment of the gains of their own labor" guaranteed to the people by Sec. 2, Art. 2, of the state constitution, is subject to reasonable regulation in the exercise of the police power.

*Jack Lincoln Shops, Inc. v. State Dry Cleaners' Board*, 1943 OK 28, 135 P.2d 332, 333, *First and Second Syllabi, appeal dismissed*, 320 U.S. 208, 63 S.Ct. 1448, 87 L.Ed. 1847 (1943).[23]

¶ 36 We conclude the Act before us is not irrelevant to the policy sought to be accomplished nor is it arbitrary, unreasonable, capricious or discriminatory. In fact, as we noted in **PART V**, enactments of this type (i.e., banning cruelty to animals) seem to have long been recognized to fall within the scope of a legitimate exercise of the police power. The Act also does not unconstitutionally discriminate. All our people are forbidden from engaging in the activities prohibited by the Act. Although we acknowledge the Act has a greater impact on those engaged in cockfighting or related activities, than on those who have not pursued such activities, no constitutional doctrine of which we are aware requires that alone to doom the enactment. The bottom line is that under our form of government, a person's right to do as he or she chooses must yield to the reasonable laws of society. We are convinced the Act under review is a valid and reasonable law enacted by the people through their reserved power of initiative; an enactment that plainly falls within the ambit of a proper, reasonable and constitutional exercise of the police power. Respondents' challenge to the Act under OKLA. CONST. art. 2, § 2 is rejected.

## PART VII. THE ACT DOES NOT UNCONSTITUTIONALLY IMPAIR THE FUNDAMENTAL RIGHT TO TRAVEL.

¶ 37 Respondents challenge § 1692.5 of the Act as being unconstitutional based on the assertion it unnecessarily infringes on the right to travel. Section 1692.5 provides in pertinent part, "[e]very person who owns, possesses, keeps, or trains any bird with the intent that such bird shall be engaged in a cockfight, upon conviction, shall be guilty of a felony." Respondents' argument is as follows:

> Section [1692.5] ... infringes the fundamental right to travel because it deters travel through Oklahoma by making the possession of birds to be used for fighting, which is perfectly legal in other states and countries, unlawful merely by passing through Oklahoma on a cross-country trip.... As written, [§ 1692.5] makes it a felony to possess any bird with the intent that the bird engage in a cockfight. A person traveling through, or flying over, Oklahoma to a cockfight in another state or country where cockfighting is legal could be convicted of a felony under [§ 1692.5]. Thus, [§ 1692.5] deters individ-

---

**23.** "The Legislature and not the courts must determine the policy of the State to be voiced in statutory enactments. Legislative power, not wisdom, is the concern of the courts." *Cotton Club v. Oklahoma Tax Commission*, 1945 OK 146, 158 P.2d 707, 708, *Fifth Syllabus*.

ual's [sic] from traveling through Oklahoma to another destination for a legitimate purpose. [Section 1692.5] therefore unnecessarily infringes on the right to travel and is unconstitutionally overbroad.[24]

There is no question a right to travel from one State to another is protected by the United States Constitution [*Saenz v. Roe*, 526 U.S. 489, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999)] and also a constitutionally protected right to travel abroad/internationally. *See United States v. Bredimus*, 352 F.3d 200, 209–210 and n. 12 (5th Cir.2003).

¶ 38 The United States Supreme Court has made it quite clear that the right to travel from one State to another "is firmly embedded in" this country's jurisprudence and that the right, depending on the context in which it is asserted and the law challenged, may emanate from more than one federal constitutional source. *See Saenz*, 526 U.S. at 500–504, 119 S.Ct. 1518 (U.S.CONST. art. IV, § 2, cl. 1 and Fourteenth Amendment, § 1, the privileges and immunities clauses concerning state and national citizenship, respectively). The federal right of interstate travel has also been based upon the Commerce Clause of the United States Constitution (U.S.CONST. art. I, § 8, cl. 3 [25]). *United States v. Guest*, 383 U.S. 745, 758–759, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966); *Edwards v. People of the State of California*, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941).

¶ 39 The right to travel interstate embraces at least three different components: 1) the right of a citizen of one State to enter and leave another State; 2) the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State; and 3) for travelers who

elect to become permanent residents, the right to be treated like other citizens of that State.[26] *Saenz*, 526 U.S. at 500, 119 S.Ct. 1518. The right to travel abroad/internationally is also a protected and valued right, and is an important aspect of a citizen's liberty under the Fifth Amendment. *Kent v. Dulles*, 357 U.S. 116, 125–127, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958). However, the right to travel abroad is accorded less stature than the right to travel interstate [*Haig v. Agee*, 453 U.S. 280, 306–307, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981) ] and is plainly subject to reasonable federal governmental regulation. *Id.* at 306, 101 S.Ct. 2766. There is also no question the right to travel is subject to protection from improper State interference, but a State is not wholly ousted from exercising its police power in matters of local concern even though the right to travel may be affected. *See Edwards v. People of the State of California*, 314 U.S. at 172–173, 62 S.Ct. 164. In our view, respondents' challenge to § 1692.5 based upon the right to travel, either interstate or abroad, is devoid of any firm foundation and is without merit.[27]

¶ 40 Although it is somewhat difficult to understand exactly the contours of respondents' assertions in regard to their travel argument, to the extent they are claiming it would be a violation of § 1692.5 for a person to pass-through Oklahoma **in possession of birds** intended to be fought in a State or country where cockfighting is legal, even assuming that § 1692.5 has sufficient reach to criminalize the mere passing-through Oklahoma **with birds intended to be fought** in another State or country where bird fighting is legal, the right to travel protected by the United States Constitution would not be im-

---

**24.** The textually quoted argument is from pp. 20–21 of the McCurtain County brief (*supra* note 5), incorporated by respondents here—said brief contained in petitioners' January 2003 appendix.

**25.** U.S.CONST. art. I, § 8, cl. 3 (the Commerce Clause) provides: "[t]he Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes[.]"

**26.** Plainly, respondents' travel challenge is not encompassed within the third component, as there is no assertion of any out-of-state resident

seeking to become a permanent resident of Oklahoma.

**27.** Respondents do not, in any brief submitted to us, expressly set forth the United States constitutional provision upon which they rely to support their travel claim. In view of our disposition, we need not definitively delineate the exact source in the federal Constitution upon which the right rests. As noted in the text, the right appears to be based on multiple portions of the United States Constitution.

pinged.[28] This is so because a federal law exists (obviously passed under Congressional authority to regulate interstate and foreign commerce under the Commerce Clause) that, among other things, bans and criminalizes the interstate and foreign transport of birds (as·with other covered animals) for partic- ipation in an animal fighting venture, **even in circumstances where animal (including bird) fighting is lawful in the ultimate destination State or country.** 7 U.S.C. § 2156 (2000), as amended by Pub.L. No. 107–171, §§ 10301–10302, the amendments printed in 2002 U.S. CODE CONG. & AD. NEWS (Vol.1).[29]

28. In view of our disposition, we need not definitively decide whether § 1692.5 has sufficient reach to cover the mere pass-through situation apparently claimed by respondents it has. We do note, however, it would not necessarily be unusual for a State to apply its criminal laws to a person passing-through the State on his way to another State, who is on a mission involving illegal activity. *See Seke v. Commonwealth of Virginia*, 24 Va.App. 318, 482 S.E.2d 88 (1997)(Virginia convictions for possession of controlled substance with intent to distribute and transportation into Virginia of controlled substance with intent to distribute upheld even though defendant intended to distribute the drugs in North Carolina and he was only passing-through Virginia at the time he was caught with the drugs, his trip beginning in New York City and to end in North Carolina).

29. 7 U.S.C. § 2156 currently provides:
(a) Sponsoring or exhibiting an animal. in an animal fighting venture
(1) In general
Except as provided in paragraph (2), it shall be unlawful for any person to knowingly sponsor or exhibit an animal in an animal fighting venture, if any animal in the venture was moved in interstate or foreign commerce.
(2) Special rule for certain States
With respect to fighting ventures involving live birds in a State where it would not be in violation of the law,·it shall be unlawful under this subsection for a person to sponsor or exhibit a bird in the fighting venture only if the person knew that any bird in the fighting venture was knowingly bought, sold, delivered, transported, or received in interstate or foreign commerce for the purpose of participation in the fighting venture.
(b) Buying, selling, delivering, or transporting animals for participation in animal fighting venture
It shall be unlawful for any person to knowingly sell, buy, transport, deliver, or receive for purposes of transportation, in interstate or foreign commerce, any dog or other animal for purposes of having the dog or other animal participate in an animal fighting venture.
(c) Use of Postal Service or other interstate instrumentality for promoting or furthering animal fighting venture
It shall be unlawful for any person to knowingly use the mail service of the United States Postal Service or any interstate instrumentality for purposes of promoting or in any other manner furthering an animal fighting venture except as performed outside the limits of the States of the United States.
(d) Violation of State law
Notwithstanding the provisions of subsection (c) of this section, the activities prohibited by such subsections shall be unlawful with respect to fighting ventures involving live birds only if the fight is to take place in a State where it would be in violation of the laws thereof.
(e) Penalties
Any person who violates subsection (a), (b), or (c) of this section shall be fined not more than $15,000 or imprisoned for not more than 1 year, or both, for each such violation.
(f) Investigation of violations by Secretary; assistance by other Federal agencies; issuance of search warrant; forfeiture; costs recoverable in forfeiture or civil· action
The Secretary or any other person authorized by him shall make such investigations as the Secretary deems necessary to determine whether any person has violated or is violating any provision of this section, and the Secretary may obtain the assistance of the Federal Bureau of Investigation, the Department of the Treasury, or other law enforcement agencies of the United States, and State and local governmental agencies, in the conduct of such investigations, under cooperative agreements with such agencies. A warrant to search for and seize any animal which there is probable cause to believe was involved in any violation of this section may be issued by any judge of the United States or of a State court of record or by a United States magistrate judge within the district wherein the animal sought is located. Any United States marshal or any person authorized under this section to conduct investigations may apply for and execute any such warrant, and any animal seized under such a warrant shall. be held by the United States marshal or other authorized person pending disposition thereof by the court in accordance with this subsection. Necessary care including veterinary treatment shall be provided while the animals are so held in custody. Any animal involved in any violation of this section shall be liable to be proceeded against and forfeited to the United States at any time on complaint filed in any United States district ·court or other court of the United States for any jurisdiction in which the animal is found and upon a judgment of forfeiture shall be disposed of by sale for lawful purposes or by other humane means, as the court may direct. Costs incurred by the United States for care of

¶ 41 Though the right to travel interstate and internationally is protected by the United States Constitution, the right is not absolute and it has been recognized there is no fundamental right to travel for an illicit purpose. *United States v. Bredimus*, 352 F.3d at 210; *see also Hoke v. United States*, 227 U.S. 308, 320–323, 33 S.Ct. 281, 57 L.Ed. 523 (1913); *United States v. Burton*, 475 F.2d 469, 471 (8th Cir.1973), *cert. denied*, 414 U.S. 835, 94 S.Ct. 178, 38 L.Ed.2d 70 (1973)(citizen's right to travel is subordinate to the Congressional right to regulate interstate commerce when the travel involves use of interstate facility for illicit purpose). In the instant case, the right respondents seek to vindicate and allegedly protect from improper State intrusion has already been curtailed by federal enactment under Congressional Commerce Clause authority, a federal enactment unchallenged on any ground by respondents here.[30]

¶ 42 Section 2156(h) of the federal law expressly provides: "[t]he provisions of this chapter shall not supersede or otherwise invalidate any such State, local, or municipal legislation or ordinance relating to animal fighting ventures except in case of a direct and irreconcilable conflict between any requirements thereunder and this chapter or any rule, regulation, or standard hereunder." Although respondents have not raised any conflict between the Oklahoma Act and § 2156, we perceive of no conflict. In fact, the two regulatory regimes appear to be congruent and harmonious: in the case of the

---

animals seized and forfeited under this section shall be recoverable from the owner of the animals if he appears in such forfeiture proceeding or in a separate civil action brought in the jurisdiction in which the owner is found, resides, or transacts business.

(g) Definitions

For purposes of this section—

(1) the term "animal fighting venture" means any event which involves a fight between at least two animals and is conducted for purposes of sport, wagering, or entertainment except that the term "animal fighting venture" shall not be deemed to include any activity the primary purpose of which involves the use of one or more animals in hunting another animal or animals, such as waterfowl, bird, raccoon, or fox hunting;

(2) the term "interstate or foreign commerce" means—

(A) any movement between any place in a State to any place in another State or between places in the same State through another State; or

(B) any movement from a foreign country into any State or from any State into any foreign country;

(3) the term "interstate instrumentality" means telegraph, telephone, radio, or television operating in interstate or foreign commerce;

(4) the term "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States;

(5) the term "animal" means any live bird, or any live dog or other mammal, except man; and

(6) the conduct by any person of any activity prohibited by this section shall not render such person subject to the other sections of this chapter as a dealer, exhibitor, or otherwise.

(h) Conflict with State law

The provisions of this chapter shall not supersede or otherwise invalidate any such State, local, or municipal legislation or ordinance relating to animal fighting ventures except in case of a direct and irreconcilable conflict between any requirements thereunder and this chapter or any rule, regulation, or standard hereunder.

**30.** As noted in the text, respondents do not attack in this case the validity of 7 U.S.C. § 2156 nor do they question Congressional authority to enact it under the Commerce Clause. In fact, although not expressly part of the travel argument made by them, respondents seem to take the position the federal law is not relevant to any issue in this case. See pg. 8 of October 20, 2003 Respondents' Response Brief to Petitioners' Brief in Support of Application to Assume Original Jurisdiction and Petition for Declaratory Relief. Respondents are incorrect that the federal law has no relevance to any issue in this case concerning the Oklahoma Act. At a minimum, the federal act has relevance to their right to travel challenge made to § 1692.5. It is plain enough to us that the federal act criminalizing the interstate and foreign transport of animals (including birds) had as one of its purposes, ensuring that in States where animal fighting is legal, that the animals used in such fighting sprout from **within** the State where such activity is legal and, as to foreign countries where the activity is legal, that the animals **not** come from the United States. In other words, the federal law seeks to prohibit from the channels of interstate and foreign commerce (i.e., between a state and a foreign country) the movement of animals intended to be used in fighting activities. Thus, respondents' pass-through travel argument is asking us to protect a right to travel for a purpose that is in violation of federal law. To us, this is nothing less than requesting us to protect a right to travel for an illicit purpose. This we decline to do.

federal law, denying the channels of interstate and foreign commerce for use in animal (including bird) fighting ventures; in the case of Oklahoma's Act, outlawing human involvement in bird fighting and related activities in the State. In essence, in view of the terms of § 2156, to uphold respondents' claim of unconstitutionality of the Oklahoma Act would mean nothing less than a holding there is a right to travel interstate and/or internationally, when such travel would be in violation of federal law and for an illicit purpose. There is no protected right to travel for an illicit purpose and there is no protected right to travel in violation of a federal law passed under authority of the Commerce Clause. Thus, we hold § 1692.5 does not unconstitutionally impinge upon the right to travel as argued by respondents.[31]

## PART VIII. THERE IS NO VIOLATION OF OKLA.CONST. ART. 5, § 57.

■ ¶ 43 OKLA.CONST. art. 5, § 57 provides in relevant part, "[e]very act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title. . . ." Section 57 applies to legislative acts promulgated by the people through the initiative process, as well as to those passed by the Legislature. *In re Initiative Petition No. 347 State Question No. 639*, 1991 OK 55, 813 P.2d 1019, 1026–1027. The purposes behind § 57 are essentially two-fold, 1) to insure that individual legislators and people are put on notice as to the effect of the legislation (*id.*, 813 P.2d at 1027) and 2) "that . . . a single subject be included in a legislative bill . . . to make impossible by log-rolling devices the enactment of unpopular legislation by including it with popular legislation on an entirely different subject." *Johnson v. Walters*, 1991 OK 107, 819 P.2d 694, 697,

quoting *Bond v. Phelps*, 1948 OK 76, 191 P.2d 938, 950.

■ ¶ 44 Section 57's purposes then are to forestall two abuses of the legislative process: 1) guarding against the enactment of legislation by surreptitious means (accomplished by having the title clearly express the subject of a proposed law) and 2) prevention of log-rolling. *See Johnson v. Walters*, 819 P.2d at 707 and n. 2 (Lavender, J., concurring in part, dissenting in part). It is not constitutionally required, however, that the title contain a complete index of all details in the act. *In re Initiative Petition No. 347 State Question No. 639*, 813 P.2d at 1027. It is sufficient that matters in the act's text are germane to the title and that the title call attention to the general subject matter of the act. *Id.* The prevention of fraudulent and surreptitious legislation is the goal without unreasonably calling into question or annulling valid legislation. *Id.* Further, legislation containing provisions which are germane, relative and cognate to one another are sufficient to meet the unity-of-subject requirement. *See Campbell v. White*, 1993 OK 89, 856 P.2d 255, 260; *see also Rupe v. Shaw*, 1955 OK 223, 286 P.2d 1094, 1098–1101 (legislation is not multi-subject merely because it contains many details as long as the details are incidental to accomplishing the general object of the enactment).

¶ 45 Respondents argue the Act contains more than one subject and that its provisions were not clearly expressed in the title voted on by the electorate. The arguments are without merit. The Act is unequivocally concerned with one subject and it is a unified, germane whole, having as its central purpose the prevention of cruelty to birds by outlaw-

---

**31.** As to respondents' travel challenge, to the extent they question § 1692.5's interference with the right to travel of Oklahoma citizens/residents and their ability to raise, breed, grow, etc. birds in Oklahoma intended to be used for fighting purposes in other States or countries, § 1692.5 plainly **does** prohibit such conduct (i.e., raising or breeding them with such an intent). No valid travel challenge exists in regard to such conduct, however, for (at a minimum) the same reason(s) we have set out concerning the failure of their pass-through travel claim.

Finally, to the extent respondents assert (regarding a travel right challenge to § 1692.5) that

it would be a violation of § 1692.5 for a person to travel through Oklahoma **without any birds in the possession of such person** while on his or her way to a cockfight in another State or another country where cockfighting is legal, we deem such a reading of § 1692.5 to be wrong. Quite simply, nothing in § 1692.5 could reasonably be read to prohibit or criminalize the conduct of a person, **without any birds then in their possession,** from merely traveling through Oklahoma on his or her way to another State or country where cockfighting is legal, **who in that other State or country owns or possesses birds used in fighting.**

ing cockfighting and related activities and providing, after a criminal conviction, for the forfeiture of birds or equipment used in any cockfighting endeavor. It also criminalizes being a knowing spectator at a cockfighting event. The ballot title of the Act as submitted to and voted on by the people follows:

This measure adds a new section to Title 21 of the Oklahoma Statutes.

The measure makes cockfighting illegal. It defines "cockfight" or "cockfighting" as:

1. A fight between birds.

2. Whether or not fitted with spurs, knives, or gaffs.

3. Whether or not bets or wagers are made on the outcome of the fight.

The definition includes training fights.

The measure defines equipment used for training or handling a fighting bird.

Under the measure:

1. It is a felony to instigate or encourage cockfighting.

2. It is a felony to keep places, equipment or facilities for cockfighting.

3. It is a felony to aid or assist in cockfighting.

4. It is a felony to own, possess, keep or train birds for cockfighting.

Under the proposal it is a misdemeanor to knowingly be a spectator at a cockfight.

The measure provides for the forfeiture of birds and equipment use[d] in cockfighting.

¶ 46 As we read the title in conjunction with the Act, it is plain the above language submitted to the voters quite·clearly spelled out the general subject of the Act and put the people on notice of the Act's provisions. Also, although the Act itself is somewhat detailed, all of its provisions are germane to its central purpose, i.e., prohibiting cockfight-

ing and related conduct associated with this type of animal fighting. Notwithstanding respondents' arguments to the contrary, we conclude the ballot title adequately described the proposed legislation that was voted on and that the Act covers but one subject. No violation of OKLA.CONST. art. 5, § 57 has been shown.[32]

**PART IX. RESPONDENTS' VAGUENESS AND OVERBREADTH CHALLENGES ARE WITHOUT MERIT.**

**A. OVERVIEW.**

¶ 47 Respondents also challenge the Act based on the claim it is unconstitutionally vague and overbroad on its face.[33] Pertinent jurisprudence used to decide if a criminal statute is unconstitutionally vague and/or overbroad plainly indicate the challenges raised must also fail. To begin, generally "in a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). As discussed below, the Act does not reach a substantial amount of constitutionally protected conduct and is not unconstitutionally vague or overbroad.

¶ 48 "As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people understand what conduct is prohibited and in a manner that does not encourage arbitrary discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *Connally v. General Const. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926) (due process requires that

**32.** We note the Supreme Court of Missouri has held that a proposition voted on by that State's electorate prohibiting fighting involving animals (which included cockfighting) did not violate Missouri's constitutional one-subject or clear-title requirements. *United Gamefowl Breeders Association of Missouri v. Nixon*, 19 S.W.3d 137 (Mo. 2000).

**33.** In our view, respondents' vagueness and overbreadth challenges are generally based on the Fourteenth Amendment standing alone, or as the

First Amendment is incorporated through the Fourteenth Amendment, and applicable State Constitutional provisions, OKLA.CONST. art. 2, § 3 (right of assembly), presumably § 7 (deprivation of liberty or property without due process) and § 22 (free speech rights). To the extent any such claim is based on OKLA.CONST. art. 2, § 2 we believe our disposition in **PART VI, PART IX(E)** and **PART IX(G)**, and our discussion at *supra* notes 13 and 22, adequately covers the claim.

"the terms of a penal statute creating a new offense must be sufficiently explicit ... [rather than] in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application").[34] "[T]he more important aspect of vagueness doctrine 'is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.' Where the legislature fails to provide such minimal guidelines, a criminal statute may permit 'a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Kolender,* 461 U.S. at 358, 103 S.Ct. 1855, quoting *Smith v. Goguen,* 415 U.S. 566, 574–75, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974).[35] Finally, "[w]here a [penal] statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the [void-for-vagueness] doctrine demands a greater degree of specificity than in other contexts." *Smith,* 415 U.S. at 573, 94 S.Ct. 1242.

 ¶ 49 Concerning facial overbreadth adjudication, the Supreme Court has stated, "particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but **substantial** as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)(emphasis added). This Court has ruled that "[a] prerequisite to an overbreadth challenge is that the law itself will create a 'realistic danger' that first amendment protections will be compromised." *In re Initiative Petition No. 341,* 1990 OK 53, 796 P.2d 267, 269. Several individual parts of the Act are challenged on

vagueness/overbreadth grounds, and each will now be addressed.

**B. Respondents assert the definition of "cockfight" or "cockfighting" is unconstitutionally vague and overbroad in failing to distinguish between innocent conduct and alleged harmful conduct.**

¶ 50 Section § 1692.1(A) of the Act provides:

"Cockfight" or cockfighting" is a **fight between birds,** whether or not fitted with spurs, knives, or gaffs, and whether or not bets or wagers are made on the outcome of the fight, and includes any training fight in which birds are intended or encouraged to attack or fight with one another. (emphasis added).

Respondents criticize the law for broadly encompassing "all birds" instead of specifically limiting its prohibition to the fighting of "cocks." No authority is cited in support of the premise that the category of "all birds" is somehow constitutionally suspect. Respondents fail to illustrate how the sweep of a statutory category of birds renders the Act vague and/or how it impinges on First Amendment rights or otherwise infringes upon constitutionally protected conduct. Instead, they attack the definition generally because it "fails to make any distinction between normally proper and allegedly improper behavior" and therefore "invites, encourages and supports law enforcement abuses that will infringe upon the lives of every citizen who has traditionally enjoyed the nature of all birds, including their natural fights for food, or for survival."

 ¶ 51 In our view, the Act is notably absent any language (such as discretion to law enforcement officers to determine wheth-

---

34. When presented with the issue of the constitutionality of 21 O.S. § 1682, the animal fighting statute, the Oklahoma Court of Criminal Appeals set forth the following "judicial yardstick" to determine the validity of a statute challenged as unconstitutionally vague: "Is the Statute clear and explicit? Is it certain? Can a man of ordinary intelligence understand it? Does it deceive the common mind? Does a person of ordinary intelligence know when the Statute is being violated? Can the Court judicially determine the Legislative intent?" *Lock v. Falkenstine, supra* note 14, 380 P.2d at 282.

35. Stated another way, a penal statute "must provide explicit standards" so as to ensure it is not arbitrarily and discriminatorily enforced. *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Although an enactment's terms may be plain, it may nevertheless be vague in that it fails to provide a "reasonably ascertainable standard of guilt." *Herndon v. Lowry,* 301 U.S. 242, 264, 57 S.Ct. 732, 81 L.Ed. 1066 (1937).

er a violation of the statute has occurred[36]) that would suggest law enforcement application in any way other than even-handedly, and respondents fail to persuasively demonstrate how the Act, as written, invites law enforcement abuse. Rather, "[t]he language of the [statute] is sufficiently clear that the speculative danger of arbitrary enforcement does not render the [statute] void for vagueness." *Village of Hoffman Estates,* 455 U.S. at 503, 102 S.Ct. 1186.

¶ 52 The Supreme Court has stated "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of the City Council v. Taxpayers for Vincent,* 466 U.S. 789, 800, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984). Further, with respect to vagueness challenges, the Supreme Court has provided " 'it seems to us that although the prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest.' " *Broadrick,* 413 U.S. at 608, 93 S.Ct. 2908, quoting *U.S. Civil Service Comm'n v. Nat'l Ass'n of Letter Carriers,* 413 U.S. 548, 578–79, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973).

¶ 53 Petitioner's [sic] Appendix to Brief in Support of Application to Assume Original Jurisdiction and Petition for Declaratory Relief contains pages of the transcript of witnesses' testimony presented at the McCurtain County temporary injunction hearing demonstrating such witnesses'—including the president of the Oklahoma Game Cock Breeders Association—understanding of the law as a ban on cockfighting. Clearly, this evidence supports a conclusion that the statutory definition of "cockfights" and/or "cockfighting" is sufficiently definite to enable people of ordinary intelligence to understand what conduct is proscribed.

¶ 54 Respondents' reliance on *Chicago v. Morales,* 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) to support their challenge is misplaced. The legislation at issue in *Morales* was a "loitering" provision, the definition of which was clear, but the uncertainty there was due to the ordinance's failure to specify what loitering was covered by it and what was not. In that the enactment involved in *Morales* failed to distinguish between innocent constitutionally protected conduct—"the freedom to loiter for innocent purposes" being a part of due process "liberty" rights—and conduct that would subject individuals to prosecution, the Supreme Court struck down the ordinance as unconstitutionally vague and overbroad. *Id.* at 53–55, 119 S.Ct. 1849. Unlike the *Morales* situation, the Act here clearly and unambiguously defines the specific conduct of "cockfight" or "cockfighting," which would subject individuals to prosecution. The law on its face does not criminalize the enjoyment and/or observation of the natural activities of birds in their natural habitat. Contrary to *Morales,* here respondents have failed to identify any constitutionally protected interest at stake. Because they have failed to demonstrate how the definition of "cockfight" or "cockfighting" presents any " 'realistic danger' that first amendment protections will be compromised by the statutory definition," they have failed to establish the prerequisite to an overbreadth challenge. *In re Initiative Petition No. 341,* 796 P.2d at 269. The statutory definition of "cockfight" and "cockfighting" is not unconstitutionally vague or overbroad.

**C. Respondents allege the term "encourages" is unconstitutionally vague and prohibiting a person from "instigating or encouraging a cockfight" is unconstitutionally overbroad.**

¶ 55 Section 1692.2 provides in pertinent part, "[e]very person who **willfully instigates or encourages** any cockfight, upon conviction, shall be guilty of a felony." (emphasis added). Respondents posit that the term "encourages" "is plainly insufficient" to apprise an ordinary person of what

---

**36.** The criminal provision in *Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983), was struck down as "unconstitutionally vague on its face because it encourage[d] arbi-

trary enforcement by failing to describe with sufficient particularity what a suspect must do in order to satisfy the statute." *Id.* at 361, 103 S.Ct. 1855.

conduct is prohibited. Additionally, they question whether an editorial opinion in a newspaper in favor of cockfighting would violate the statute and whether statements made to another to the effect that the person should hold a cockfight would violate it. In our view, to the extent this part of the Act may reasonably be construed to prohibit the verbal act of willful encouragement of cockfights, we note that the Supreme Court has provided that "[a] statute punishing verbal acts, carefully drawn so as not unduly to impair liberty of expression is not too vague for a criminal law." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 574, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). As set out in more detail in the overbreadth analysis, we conclude the Act is carefully drawn and does not unduly impair liberty of expression. To the extent the prohibition against "willfully instigat[ing] or encourag[ing]" cockfighting, may be accomplished by a verbal act, it is not unconstitutionally vague.

¶ 56 Respondents cite *State v. Young*, 695 S.W.2d 882 (Mo.1985) for the proposition the term "encourage" in an animal fighting statute is unconstitutionally vague. However, review of *Young* illustrates it was not the term "encourages" alone which prompted the Missouri Supreme Court's conclusion that the Missouri statute was unconstitutionally vague.[37] The primary basis for determining the statute in *Young* was unconstitutionally vague and contravened due process was that it, as written, criminalized the mere presence at a place where cockfights are held. Critical to the decision was the Missouri statute's failure to contain the necessary "requirement of unlawful intent to give meaning to the presence provision." *Id.* at 885.

¶ 57 The opinion in *Young* additionally criticized several terms of the statute, which "read in the context of the entire statute" revealed "additional ambiguities." *Id.* at 886. Specifically, the Missouri Supreme Court criticized language in the statute, which "seem[ed] to make it unlawful to [encourage], 'aid or assist' **a place** used for cockfighting." *Id.* (emphasis added). They went on to note "[y]et it is more likely that one encourages other individuals, not places." *Id.* While respondents assert the term "encourage" in the Oklahoma statute is similarly vague and that just as one cannot encourage a place, one cannot encourage cockfighting, the plain meaning of the words of § 1692.2 taken as a whole and read in context along with the definition of "cockfight" demonstrate these provisions clearly prohibit **individuals** from encouraging **birds** to attack or fight. Thus, under the terms of the Oklahoma statute, it is appropriately individuals who are prohibited from doing the acts of encouraging actual cockfighting. Additionally, common sense tells us that unlike places, which cannot be encouraged, birds can in fact be encouraged to attack one another, which is the conduct this part of the Act is designed to prohibit. *Young* is therefore distinguishable from the instant case, as the wording of the Oklahoma statute and particularly the term "encourage" in the context with the rest of the statute, is plain and unambiguous.

¶ 58 Furthermore, the Supreme Court of Iowa construed a similarly worded statute,[38] which prohibited "encouraging a cockfight," as not unconstitutionally vague nor overbroad. *State v. Todd*, 468 N.W.2d 462, 465–466 (Iowa 1991). In *Todd* it was held, the statute, "which makes it a crime to 'engage

---

37. The Missouri statute provided in pertinent part as follows:

 Any person who shall keep or use or in any way be connected with or interested in the management of, or shall receive money for the admission of any person to, any place kept or used for the purpose of fighting or baiting any bull, bear, dog, cock or other creature, and any person who shall encourage, aid or assist or be present thereat, or shall permit or suffer any place belonging to him or under his control to be so kept or used, shall, on conviction thereof, be guilty of a misdemeanor. Mo.Rev.Stat. § 578.050 (1978).

38. The statute under review in *State v. Todd*, 468 N.W.2d 462 (Iowa 1991)(Iowa Code § 725.11) provided:

 If any person keep or use, or in any way be connected with, or be interested in the management of, or receive money for the admission of any person to, any place kept or used for the purpose of fighting or baiting any bull, bear, dog, cock, or other creature, or engage in, aid, abet, **encourage,** or assist in any bull, bear, dog, or cock fight, or a fight between any other creatures, the person shall be guilty of a serious misdemeanor. (emphasis added).

in, aid, abet, **encourage,** or assist' in any cockfight is sufficiently clear to give a person of ordinary intelligence fair notice of what is prohibited and provide the specific standards required for those who enforce it, and is not unconstitutionally vague under either the United States or Iowa Constitutions." *Id.* at 465 (emphasis added) (citation omitted). Just as in *Todd,* a person of ordinary intelligence can understand and is given fair notice of what conduct is prohibited and therefore, respondents' vagueness challenge to the term "encourages" fails.

¶ 59 Respondents also assert § 1692.2's prohibition against "willfully instigat[ing] or encourag[ing] any cockfight" infringes upon and/or chills their First Amendment rights [39] because "it prohibits them from speaking freely about fights between birds." Although this statute may be interpreted to prohibit certain speech that "willfully instigates or encourages" cockfighting, the statute does not violate First Amendment rights because communication which incites the imminent lawless action of cockfighting does not constitute protected speech. The Supreme Court has ruled "[a]n advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause. *When such appeals do not incite lawless action,* they must be regarded as protected speech." *N.A.A.C.P. v. Claiborne Hardware Co.,* 458 U.S. 886, 928, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982)(emphasis added).

¶ 60. In that the Oklahoma statute is primarily directed at the conduct of cockfighting and the willful instigation or encouragement of same, and "not merely speech is involved," the overbreadth test of *Broadrick v. Okla-*

*homa* must be applied to determine whether the alleged overbreadth of this statute "is not only ... real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." 413 U.S. at 615, 93 S.Ct. 2908. The Act's sweep, even if it may be susceptible of some improper applications by reaching protected speech (not at all plain from the Act's terms), this reach is incidental and insubstantial in relation to the legitimate purpose to prohibit the conduct of willful instigation and encouraging cockfighting and as such is not substantially overbroad so as to render it unconstitutional on its face. *See id.* at 618, 93 S.Ct. 2908.

¶ 61 We interpret the term "encourage" as prohibiting only speech and/or conduct, which encourages the **imminent** lawless action of cockfighting as distinguished from mere advocacy of the use of force or violence, which constitutes protected speech under the First Amendment. *See Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); *Grayned v. Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Chaplinsky v. New Hampshire, supra; N.A.A.C.P. v. Claiborne Hardware Co., supra.* The primary purpose of the Act is the prevention of cruelty to birds. In order for the Act to fulfill this purpose, it also prohibits the conduct of willful instigation or encouragement of a cockfight. In that communication encouraging, appealing to and inciting immediate cockfighting (now deemed lawless action under the Act) is geared to prohibit speech directed at inciting imminent lawless conduct, such speech is not protected speech under either the First Amendment to the United States Constitution or under OKLA.

---

**39.** Courts in other jurisdictions have soundly rejected First Amendment challenges to similarly worded anti-cockfighting statutes. *See e.g., State v. Todd, supra* note 38, 468 N.W.2d at 466 (holding the Iowa statute, which prohibits those who "engage in, aid, abet, encourage, or assist" a cockfight "is a description of 'easily identifiable and proscribable ... conduct,' which falls within the statute's 'plainly legitimate sweep'" and is not unconstitutionally overbroad); *Commonwealth v. Balog, supra* note 9, 672 A.2d at 321 (holding statute making it a "felony to own, possess, keep, train, promote, purchase or knowingly sell any animal for animal fighting" is not

unconstitutionally overbroad); *West Valley City v. Streeter,* 849 P.2d 613, 616 (Utah App.1993) (holding statute stating "that it is unlawful for 'any person or corporation to raise, keep or use any animal, fowl or bird for the purposes of fighting or baiting'... is not unconstitutionally overbroad because it does not impinge on any constitutionally protected conduct"); *State v. Albee,* 118 Or.App. 212, 847 P.2d 858, 861 (1993), *review denied,* 316 Or. 528, 854 P.2d 940 (1993)(holding statute prohibiting person from "promoting, conducting, participating in or being spectator at exhibition of animal fighting" did not violate the First Amendment).

CONST. art. 2, § 22.[40]

¶ 62 Finally, a reasonable, common sense reading of the statute does not prohibit any person from "speaking freely" about cockfighting, nor does it prohibit any other speech that merely advocates such conduct. Therefore, § 1692.2, as worded, is not substantially overbroad and it is not unconstitutional on its face.

**D. Respondents contend that § 1692.3 is unconstitutionally overbroad in violation of a constitutional right to own and use property.**

¶ 63 Section 1692.3 provides in pertinent part, "[e]very person who keeps any pit or other place, or knowingly provides any equipment or facilities to be used in permitting any cockfight, upon conviction, shall be guilty of a felony." Respondents claim the provision is so broadly written that it criminalizes any and all keeping of a pit or place for any purpose and thus, "the mere ownership of a gravel pit or sand pit would be a violation even if never ·used for a 'fight between birds." Petitioners' response to the assertion is that such an interpretation is absurd, and that § 1692.3 seeks to "penalize persons knowingly providing physical facilities or equipment for cockfighting." Petitioners are correct. It is virtually impossible

to imagine any law enforcement officer, district attorney or other person from interpreting § 1692.3 in a manner as suggested by respondents. When the words "keeps any pit or other place" are read in context with the remainder of the statutory language, the prohibition is readily understood and clearly limited in scope to prohibit the keeping of "any pit or other place ... to be used in permitting any cockfight."

¶ 64 The Supreme Court has provided, "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of the City Council v. Taxpayers for Vincent, supra,* 466 U.S. at 800, 104 S.Ct. 2118. This Court has provided that statutes should be "given rational construction" and construed in such a way as to avoid absurdity. *Ledbetter v. Alcoholic Beverage Laws Enforcement Comm'n,* 1988 OK 117, 764 P.2d 172, 179; *Special·Indem. Fund v. Choate,* 1993 OK 15, 847 P.2d 796, 807.

¶ 65 Other jurisdictions have upheld similar legislation under a common sense interpretation. The Supreme Court of Utah upheld an ordinance, which prohibited "keeping or using a gamecock for the purpose of fighting" or being a "party to or present as a spectator at such fighting." *Peck v. Dunn,*

40. The Supreme Court cases cited in the text [*N.A.A.C.P. v. Claiborne Hardware Co.,* 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982); *Grayned v. City of Rockford, supra* note 35; *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); and *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)] demonstrate "that "fighting words"—those that incite immediate breach of the peace," (*Chaplinsky,* 315 U.S. at 572, 62 S.Ct. 766) or "advocacy ... directed to inciting or producing imminent lawless action and is likely to incite or produce such action," (*Brandenburg,* 395 U.S. at 447, 89 S.Ct. 1827)—are not entitled to constitutional protection. Although this Court has determined "that the Oklahoma Constitution is more protective of speech than is the United States Constitution," (*In re Initiative Petition No. 366,* 2002 OK 21, ¶ 7, 46 P.3d 123, 126) (citations omitted), this protection is not absolute and clearly does not extend to "fighting words" and/or "incitement to imminent lawless activity." See *Gaylord Entertainment Co. v. Thompson,* 1998 OK 30, ¶ 19 and n. 46, 958 P.2d 128, 141– 142 and n. 46 (citations omitted); *Price v. State,* 1994 OK CR 26, 873 P.2d 1049. Thus, respon-

dents' assertion that part of the Act criminalizes all speech and/or editorial advocacy of a procockfighting position (or alternatively criticizing and/or urging the repeal of the Act) is without merit because clearly such advocacy is protected speech and would not be subject to prohibition or prosecution under a common sense, reasonable interpretation and application of the plain meaning of the statutory language. See *State v. Albee, supra* note 39, 847 P.2d at 861 (unnecessary to decide if a restriction on gathering to discuss cockfighting would be a restriction on constitutionally protected conduct, because statute read not to prohibit that conduct). To the extent respondents assert the Oklahoma provision may have a chilling effect on protected speech, even if there may be such a chilling effect "to some unknown extent, there comes a point where that effect—at best a prediction—cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe." *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

574 P.2d 367, 368 (Utah 1978), *cert. denied,* 436 U.S. 927, 98 S.Ct. 2822, 56 L.Ed.2d 770 (1978); *see also State v. Tabor,* 678 S.W.2d 45, 47 (Tenn.1984) (ruling a statute "must be read with common sense and will be interpreted and applied by the courts only to prohibit persons from assembling deliberately and knowingly, to watch animals being exhibited, baited, or fought for the purpose of injuring other animals for amusement, sport or gain"). When faced with a strained interpretation of the anti-cockfighting legislation at issue there, *Peck* stated:

> [I]t is not our duty to indulge in conjecture that the statute may be so distorted or unreasonably applied that some innocent person might come within its terms. Rather, it is our duty to assume that those who administer a statute will do so with reason and common sense, in accordance with its language and intent; and further, that if there is a choice as to the matter of its interpretation and application, that should be done in a manner which will make it constitutional, as opposed to one which would make it invalid.

574 P.2d at 369.[41]

¶ 66 Respondents' assertion that the provision prohibits individuals from owning a sand pit or place for any purpose is a distorted and unreasonable interpretation, inconsistent with common sense. Clearly, it would be an impermissible application of the Act to prosecute someone for the keeping of a pit or other place for a legitimate legal purpose unrelated to cockfighting. The mere fact respondents can conceive of unreasonable impermissible applications of the Act is insufficient to render it unconstitutionally overbroad. Therefore, their overbreadth

challenge premised upon a nonsensical interpretation is rejected.

**E. Respondents challenge § 1692.4, which prohibits "any act" or "service" in furtherance of a cockfight, as unconstitutionally overbroad in violation of the First Amendment and OKLA.CONST. art. 2, § 2.**

¶ 67 Section 1692.4 provides in relevant part:

> Every person who does **any act** or performs **any service in the furtherance of or to facilitate** any cockfight, upon conviction, shall be guilty of a felony. Such activities and services specifically prohibited by this section include, but are not limited to: promoting or refereeing of birds at a cockfight, advertising a cockfight, or serving as a stakes holder of any money wagered on any cockfight. (emphasis added).

In support of the argument the provision violates the First Amendment and "interfere[s] with a person's right to pursue a livelihood in violation of Article II, Section 2 of the Oklahoma Constitution,"[42] respondents assert that § 1692.4 prohibits "any act" or "service" without regard to whether the person actually acted or provided the service and had the intent to facilitate a fight between birds or "even had knowledge of the cockfight." They reiterate their assertion that this provision infringes upon First Amendment rights because it purportedly prohibits a person from making a speech in favor of a fight between birds, arguing such a speech constitutes an act in furtherance of a cockfight. Respondents also cite as an example of conduct purportedly subject to prosecution under § 1692.4, a copy-shop own-

---

**41.** The plaintiff in *Peck v. Dunn,* 574 P.2d 367 (Utah 1978), *cert. denied,* 436 U.S. 927, 98 S.Ct. 2822, 56 L.Ed.2d 770 (1978), argued the provision was unconstitutionally "vague and uncertain" because under its terms, an "innocent passing by onlooker" could be prosecuted. *Id.* at 369. The Utah Supreme Court rejected this interpretation, instead, determining "a sensible and practical application of the ordinance would require a person to be present as a spectator in the sense of one purposefully and intentionally attending and observing such a fight, as opposed to some mere passerby happening to so observe it." *Id.* at 370. Finally, the *Peck* Court announced, "[i]f the ordinance is thus looked at

and applied in what we have stated to be a sensible and practical way, we see no justification for declaring it unconstitutional." *Id.*

**42.** To the extent respondents' argument amounts to the assertion they have a constitutional or inherent right to earn a living by fighting birds or breeding them for fighting, which cannot be prohibited by valid police power legislation, the argument fails under both the United States and Oklahoma Constitutions. We believe our analysis as set forth in **PART IV, PART V** and **PART VI** adequately disposes of any such claim.

er who provides a self-serve copier for the use of another to print fliers advertising a cockfight.

¶ 68 They also assert the provision provides for a strict liability offense and posit hypothetical prosecutions which, in our view, present a strained construction of the statutory language. As a starting point, because the statute is directed at conduct, i.e., "act or performs any service", and arguably may touch on speech incidental to such action and/or performance of service in the furtherance of or to facilitate any cockfight, the overbreadth test of *Broadrick v. Oklahoma* must be applied to determine whether the alleged overbreadth of this statute "is not only ... real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." 413 U.S. at 615, 93 S.Ct. 2908. The statute's sweep, even if it is "susceptible of some ... improper application" and reaches and/or chills protected speech at all, is incidental at best to the legitimate purpose of the section to reach the prohibited conduct of acts and services performed in the furtherance of or in facilitation of cockfights and is not substantially overbroad so as to render it unconstitutionally overbroad on its face. *See id.* at 618, 93 S.Ct. 2908. Further, as previously noted, the U.S. Supreme Court has additionally provided "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of the City Council v. Taxpayers for Vincent,* 466 U.S. at 800, 104 S.Ct. 2118.

¶ 69 This Court has provided "[i]n the interpretation of statutes, courts do not limit their consideration to a single word or phrase in isolation to attempt to determine their meaning, but construe together the various provisions of relevant legislative enact-

ments to ascertain and give effect to the legislature's intention and will, and attempt to avoid unnatural and absurd consequences." *McNeill v. City of Tulsa,* 1998 OK 2, ¶ 11, 953 P.2d 329, 332; *see also Ledbetter v. Alcoholic Beverage Laws Enforcement Comm'n,* 764 P.2d at 179; *Special Indem. Fund v. Choate,* 847 P.2d at 807. Furthermore, regarding criminal statutory construction, the Oklahoma Court of Criminal Appeals has held "[w]here an act is readily subject to a narrowing construction which would avoid violation of the overbreadth doctrine, then that narrow construction should be applied and the act should be upheld against a facial challenge." *Gilbert v. State,* 1988 OK CR 268, 765 P.2d 1208, 1210 (1988); *see also Walker v. State,* 1982 OK CR 5, 639 P.2d 1255 (construing Indecent Telephone Conversation criminal statute as containing an implied limitation that the prohibited language be spoken to an unwilling listener and thus, the statute was not unconstitutionally overbroad).

¶ 70 While § 1692.4 could have, and perhaps, should have been drafted more precisely with the inclusion of express terms of a culpable mental state, even in the absence thereof, a common sense reading of the provision in context with the rest of the Act leads us to conclude the plain intent was to prohibit knowing acts and/or services in furtherance of cockfighting such as the specific acts/services listed therein. *See Peck v. Dunn,* 574 P.2d at 369 (determining that despite the absence of express terms requiring a culpable mental state, a sensible and practical application of the cockfighting ordinance would require purposeful and intentional presence as a spectator as opposed to a mere passerby to fall within ordinance's terms).[43] Respondents' overbreadth challenge to § 1692.4 must fail.

---

43. The Supreme Court has determined the absence of a scienter requirement in an obscenity ordinance "may tend to work a substantial restriction on the freedom of speech and of the press." *Smith v. California,* 361 U.S. 147, 150, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959). In *Smith,* the Court struck down an obscenity ordinance that imposed strict liability on a book seller (for the mere possession of obscene material without knowledge of the contents) as unconstitutional, reasoning that "[b]y dispensing with any require-

ment of knowledge of the contents of the book on the part of [a book] seller, the ordinance tends to impose a severe limitation on the public's access to constitutionally protected matter." *Id.* at 153, 80 S.Ct. 215. In the aftermath of *Smith,* courts have determined the constitutionality of such obscenity legislation on the basis that such laws "must, either expressly or impliedly, require scienter." *Ellenburg v. State,* 215 Tenn. 153, 384 S.W.2d 29, 30 (Tenn.1964). Several states have implied scienter to statutes as a result of *Smith.*

**F. Respondents allege the terms "spectator" and "preparations" as used in § 1692.6 are unconstitutionally vague and that prohibiting presence at cockfight preparations is unconstitutionally overbroad in violation of constitutionally protected rights to association and assembly.**

¶ 71 Section 1692.6 provides:

Every person who is **knowingly** present as a **spectator** at any place, building, or other site where **preparations** are being made for a cockfight with the **intent** to be present at such preparation or cockfight, or is **knowingly** present at such cockfight, upon conviction shall be guilty of a misdemeanor. (emphasis added).

Respondents assert the term "spectator" is insufficient to put an ordinary person on notice of conduct in which he/she may or may not lawfully engage. Contrary to the express language of the statute that plainly prohibits **knowing and intentional** presence, they also argue the law can be read to proscribe an innocent onlooker's mere presence at a cockfight. They also seem to assert the provision somehow unconstitutionally impinges on rights to freely associate with others or to assemble. These arguments are without merit.

■ ¶ 72 Courts in other jurisdictions faced with similar challenges to the term "spectator" in cockfighting and/or animal fighting legislation have rejected such vagueness challenges. *See Peck v. Dunn,* 574 P.2d at 369 (sensible and practical application requires a person to be present as a spectator in the sense of one purposefully and intentionally attending and observing such a fight, as opposed to a mere passerby happening to observe it); *State v. Tabor,* 678 S.W.2d at 47 (upholding cockfighting statute, which prohibits spectators who are knowingly and deliberately present at cockfight or at site where preparations are being made for such activities); *People v. Superior Court (Elder),*

201 Cal.App.3d 1061, 1070, 1073–1074, 247 Cal.Rptr. 647 (5th Dist.Cal.App.1988), *cert. denied,* 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989)(noting " 'spectator' is not a technical, legal term, but rather a word of common usage," and holding the term "spectator," when construed with the relevant portion of the statute, requires " 'purposeful presence' as a spectator ... for the purpose of watching the animal fighting and is constitutional as construed"). While Oklahoma's Act does not include a statutory definition of the term "spectator," it is the general "rule of statutory construction that words in a statute are to be understood in their ordinary sense, except when a contrary intention plainly appears." *Gilbert v. State,* 765 P.2d at 1210. In *Gilbert,* our Court of Criminal Appeals provided that a criminal statutory term need not be expressly defined in the statute itself, but that the meaning of such words are to be determined "in context" with the rest of the statute. *Id.*

■ ¶ 73 Under the rule of *Gilbert,* the term "spectator" should be understood in its ordinary sense, which is "an observer of an event." AMERICAN HERITAGE DICTIONARY, 1173 (2d ed.1985); *see also People v. Superior Court (Elder),* 201 Cal. App.3d at 1070, 247 Cal.Rptr. 647 (providing additional common definitions of the term "spectator" from different dictionaries). We need not search for any implicit meaning behind the words of the statute, as the meaning is plain, to wit: the person subject to prosecution is one who is purposefully and knowingly present at a cockfight or at a place where preparations are being made for a cockfight. Respondents' hypothecation that the law ensnares within its ambit an innocent passerby who comes upon bird fight preparations and stops to determine what activity is occurring or that a law enforcement officer who is present to arrest others falls within the term "spectator" are unavail-

See *Ellenburg,* 384 S.W.2d at 30 (and cases cited therein). Just as scienter may be implied in the context of obscenity statutes, scienter may be implied in the context of § 1692.4 to prohibit "every person who [*knowingly*] does any act or [*knowingly*] performs any service in the furtherance of or to facilitate any cockfight." (emphasis added). To the extent the hypothetical copy-

shop owner may be construed as analogous to the book seller in *Smith,* just as a book seller cannot be prosecuted for mere possession of obscene material of which he has no knowledge, an innocent copy-shop owner likewise cannot be prosecuted under § 1692.4 for another's copying of materials, the nature of which the copy-shop owner has no knowledge.

ing. Neither hypothetical is reasonably within the Act's orbit, and, quite frankly, the law enforcement example is absurd and non-sensical. The term "spectator" as that word is understood in its ordinary sense in context with the statutory terms, is a purposeful, knowing or intentional observer of an event. Therefore, we reach the inescapable conclusion that the term, as construed with the rest of § 1692.6, is not unconstitutionally vague.

¶ 74 Respondents also challenge the term "preparations" contained in § 1692.6 as insufficient to put an ordinary person on notice of the conduct in which he/she may or may not lawfully engage, i.e., that it is unconstitutionally vague. They also assert prohibiting presence at cockfight preparations is unconstitutionally overbroad. As a practical matter these arguments overlap. In our view, the provision as properly understood does not suffer from unconstitutional vagueness or overbreadth.

¶ 75 In the first place, there is jurisprudence from other jurisdictions upholding as constitutional similarly worded statutes prohibiting spectators's knowing presence at a place where "preparations" for cockfighting are taking place. See State v. Albee, 118 Or.App. 212, 847 P.2d 858 (1993), review denied, 316 Or. 528, 854 P.2d 940 (1993)(rejecting vagueness challenge to statute prohibiting person's presence as a spectator at a cockfight or "preparations thereto," even though such term is not defined by the statute); State v. Tabor, 678 S.W.2d at 47 (determining "there was nothing either uncertain or unclear about the meaning of" the Tennessee statute "prohibiting persons from knowingly being present as spectators at a cockfight or similar exhibition, or at a place where preparations are being made for such

an exhibition"); see also Peck v. Dunn, supra.[44]

¶ 76 Secondly, we are guided by the general rule enunciated in Gilbert, which provides that we are to construe terms of a criminal statute in accordance with their generally accepted meaning and in context with the rest of the statute. Gilbert, 765 P.2d at 1210. "Preparations" is understood generally as "the act or process of preparing or the state of being prepared; readiness.... Preliminary measures that serve to make ready for something." AMERICAN HERITAGE DICTIONARY, 978 (2d ed.1985). When the term "preparations" is construed with the rest of the statutory language, the criminal offense is defined with sufficient definiteness that an ordinary person would understand what conduct is prohibited. In other words, the common sense meaning of the provision is that the person subject to prosecution as a spectator is one who purposefully, knowingly and intentionally is observing a cockfight or those preparations immediately prior to the cockfight at the cockfighting venue, that serve as preparations for the cockfight, e.g., exhibiting the birds before the fight. Section 1692.6 does not criminalize mere presence at a restaurant where other individuals are gathered to discuss or plan a fight between birds; mere presence at a store where others are purchasing supplies for a fight between birds; mere presence at a copy shop where fliers advertising a fight between birds are being printed by others; or mere presence at a barn that is being swept by another several days before a fight between birds is to be held there. The aforementioned are all examples put forward by respondents as conduct that could potentially fall under the terminology contained in § 1692.6. Respondents' interpretation is simply not a reasonable or common sense read-

---

**44.** In 1990, after State v. Tabor, 678 S.W.2d 45, 47 (Tenn.1984), the Tennessee Legislature amended that state's cockfighting statute by lowering the penalty for cockfighting from a felony to a Class A misdemeanor and decriminalized ownership and possession of cocks for breeding purposes. However, the subsection at issue in Tabor (and pertinent to our analysis here), which prohibited spectators' knowing presence at cockfighting preparations, was retained in the statute. Comparison of the Tennessee cockfighting statute

with § 1692.6 reveals several similarities. The Tennessee statute provides in pertinent part as follows:

"It is unlawful for any person to ...

(4) Be knowingly present, as a spectator, at any place or building where preparations are being made for an exhibition for such fighting, baiting or injuring of any animal, with the intent to be present at such exhibition, fighting, baiting or injuring." Tenn.Code Ann. § 39–14–203.

ing of the provision.[45] Therefore, § 1692.6 is not unconstitutionally vague or overbroad as argued by respondents nor does it, as respondents contend, unconstitutionally violate a right to associate or assemble with others.

## G. Respondents contend § 1692.1(B), which declares certain equipment contraband and subjects it to potential seizure, is unconstitutionally vague [46] and overbroad in violation of a constitutional right to own and use property.

¶ 77 Section 1692.1(B) provides:

'Equipment used for training or handling a fighting bird' include knives or gaffs, cages, pens, feeding apparatuses, training pens and other related devices and equipment, and is hereby declared contraband and subject to seizure.

Respondents assert Section 1692.1(B), which includes specific items comprising the general category of "equipment used for training or handling a fighting bird," sweeps too broadly to include items without regard to whether such equipment or devices are used for fights between birds. They also assert that "all turkey feeders are contraband under the law." Although respondents do not specifically assert the provision's alleged overbreadth violates their First Amendment rights, they argue it "invades an individual's right to own and use property for traditionally normal purposes." [47]

■ ¶ 78 Again, respondents seek to have us construe individual statutory words in isolation, while ignoring related plain language of the provision. To construe § 1692.1(B) as

---

**45.** To support their vagueness argument, respondents cite *State v. Wear*, 15 Ohio App.3d 77, 472 N.E.2d 778, 781 (12th Dist.1984)(construing constitutionality of statute prohibiting "[a]ny person who knowingly purchases a ticket of admission to such place [kept for the purpose of cockfighting], or is present thereat, or witnesses such spectacle, is an aider and .abettor") and *State v. Abellano*, 50 Haw. 384, 441 P.2d 333, 334 (1968)(construing constitutionality of statute prohibiting "any person to engage or participate in or to be present at, any cockfighting exhibition"). They also rely on *State v. Wear* to support the overbreadth claim. We are also aware of other authority supportive of respondents' general assertions. *See e.g., State v. Young*, 695 S.W.2d 882 (Mo.1985)(holding cockfighting statute unconstitutionally vague because it prohibited the mere presence without the requirement that "the offender ... be present at such a place for the purpose of being a spectator at a cockfight"). We acknowledge these authorities, but conclude they are distinguishable and/or inapplicable here because the Oklahoma Act contains express language of a culpable mental state of "knowing" and "intent," which qualify and limit the terms "present as a spectator," and because as we read the statute, the person subject to prosecution as a spectator is one who purposefully, knowingly and intentionally is observing a cockfight or those preparations immediately prior to the cockfight at the cockfighting venue, that serve as preparations for the cockfight, e.g., exhibiting the birds before the fight. To us, although § 1692.6 may have been worded more precisely, the terms of the provision refer to the place where the cockfighting event is to take place. As such, it does not ensnare within its provisions, as spectators, people anywhere they happen to be in the State merely because they are present at a locale where others are engaged in the activities of planning a cockfight or engaging in other activities preparatory thereto, e.g., someone who hap-

pens to be present at a store where another person is buying some type of equipment with the intent to use the equipment in a cockfighting endeavor.

**46.** Respondents raise this particular vagueness challenge in the brief of plaintiffs filed in the McCurtain County case (which is attached to petitioners' January 2003 appendix here). They urge the law "does not sufficiently define what conduct is unlawful" because they assert "[t]he [statutory] language does not require that the equipment of [sic] device be used for cockfighting." In that this vagueness challenge is premised upon an unreasonable and strained interpretation of the statutory language contained in this definition of § 1692.1(B), which plainly and unambiguously limits the category of equipment subject to seizure as only the "equipment used for training or handling a fighting bird," we reject this vagueness challenge. Furthermore, as we have set out in *supra* note 13, it is plain to us, any seizure of cockfighting-related equipment was only intended to be allowed consistent with the applicable dictates of the search and seizure provisions of the United States and Oklahoma Constitutions and pertinent State statutes concerning issuance of warrants and the seizure of property.

**47.** The argument is related to respondents' similar assertion that the Act or one or more of its provisions violates a "right to pursue a livelihood." While respondents generally appear to label their conduct in this manner in an attempt to cloak it with constitutional protection, no authority is cited for the proposition that the real conduct at issue in this case—cockfighting and those activities. or conduct outlined in the Act related to the cockfighting endeavor—is constitutionally protected.

argued by respondents is inconsistent with this Court's longstanding rule of statutory interpretation, which provides "[i]n the interpretation of statutes, courts do not limit their consideration to a single word or phrase in isolation to attempt to determine their meaning, but construe together the various provisions of relevant legislative enactments to ascertain and give effect to the legislature's intention and will, and attempt to avoid unnatural and absurd consequences." *McNeill v. City of Tulsa*, 1998 OK 2, at ¶ 11, 953 P.2d at 332. In interpreting the meaning of the definitional terms, we are bound to construe the words together, which is accomplished by referencing each specific item in the statutory list with relation back to the category of "equipment used for training or handling a fighting bird"—rather than taking each listed item in isolation without reference to the general category to which the particular items are a part.

■ ¶ 79 Further, this Court has ruled where a general statutory term is followed by the word "include," the primary import of words following that word indicates "restricted meaning" to the general term, which came before it. *Application of Central Airlines, Inc.*, 1947 OK 312, 185 P.2d 919, 924. It is quite plain to us that the words "knives or gaffs, cages, pens, feeding apparatuses, training pens and other related devices and equipment," all of which follow the phrase "equipment used for training or handling a fighting bird" are words of restricted import and that they relate back to the preceding phraseology of the definition.[48] According to the applicable rules of statutory construction, such an "express [statutory] declaration of what is to be included leaves no room for enlargement through implication." *Id.* at 924. Contrary to respondents' argument, § 1692.1(B) does not declare all turkey (or any other category of bird) feeders contraband. The language on its face limits the category to

"equipment used for training or handling a fighting bird." Thus, as plainly expressed in the terms of the provision, only those items of equipment or devices, which are used for training or handling a fighting bird, are included within the provision's sweep.

## PART X. CONCLUSION.

¶ 80 The instant case is *publici juris* in nature, as it concerns the people or community at large and is imbued with the public interest. Further, there is a pressing need for this Court to decide the matter at the present time because District Court temporary restraining orders and/or temporary injunctions have, in effect, made it impossible for law enforcement officials in over twenty-five (25) counties to carry out their duties under the Act, even though no valid basis was or has been espoused or put forward by respondents to enjoin enforcement or prosecution under the Act. The case, therefore, presents one of those rare circumstances where the exercise of our discretion to assume original jurisdiction is called for to grant declaratory relief, notwithstanding that this Court and the District Courts have concurrent jurisdiction. We, therefore, assume original jurisdiction and rule on respondents' constitutional challenges to the Act.

¶ 81 A court's place, when called on to review constitutional challenges to legislation promulgated by the people through the initiative (as it is with statutory enactments passed by the Legislature), is not to second guess the law's wisdom, but to review the measure for constitutional conformity and to strike the enactment down only if found constitutionally infirm. In the instant case, the Act is a proper exercise of the police power, enacted by the electorate through the initiative process by virtue of its reserved legislative power. As a facial matter, the Act: does not constitute a taking or damaging of prop-

---

**48.** This rule is derived from the "ancient and generally accepted rule of construction known as 'Noscitur A Sociis' which . . . means: 'The meaning of a doubtful word may be ascertained by reference to the meaning of words associated with it.'" *Application of Central Airlines, Inc.*, 1947 OK 312, 185 P.2d 919, 923–924 (citation omitted); *see also Huffman v. Oklahoma Coca-Cola Bottling Co.*, 1955 OK 76, 281 P.2d 436, 440 (providing that "a statute should not be construed any more broadly or given any greater effect than its terms require. Where the language of the statute is clear in limiting its application . . . and leaves no room for doubt as to the intention of the legislature, there is no authority to transcend or add to the statute, [and the statute] may not be enlarged, stretched, or expanded, or extended. . . .").

erty for public use without just compensation; does not violate the Contract Clauses of either the United States or Oklahoma Constitutions as argued by respondents; is not impermissibly invasive of any right of respondents or others similarly situated found in OKLA.CONST. art. 2, § 2, as asserted; does not impermissibly or unconstitutionally infringe upon a fundamental right to travel as claimed by respondents; was not promulgated in violation of OKLA.CONST. art. 5, § 57 as posited by respondents; and, finally, is not unconstitutionally vague or overbroad as claimed, so as to deprive respondents of liberty or property without due process of law, or so as to be violative of rights to free speech, assembly or association, as respondents assert.

¶ 82 Consistent with the views expressed in this opinion,

**ORIGINAL JURISDICTION IS ASSUMED AND DECLARATORY RELIEF IS GRANTED.**

¶ 83 WATT, C.J., HODGES, LAVENDER, HARGRAVE, KAUGER, BOUDREAU and WINCHESTER, JJ., concur.

¶ 84 OPALA, V.C.J. and EDMONDSON, J., disqualified.

